**CASES ARGUED AND DETERMINED**

IN THE

# SUPREME COURT

OF THE

# STATE OF CONNECTICUT

————————

## STATE OF CONNECTICUT *v.* FRANKLIN FOSTER
### (SC 20829)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

The acquittee, who had been found not guilty by reason of mental disease or defect of first degree burglary, risk of injury to a child, third degree assault, and possession of a weapon on school grounds, was committed to the jurisdiction of the Psychiatric Security Review Board in 2003, for a period not to exceed ten years. The acquittee's commitment was extended multiple times by agreement of the parties, but, in 2018, he was granted conditional release and began living in the community, subject to his compliance with certain conditions relating to his ongoing mental health treatment. Thereafter, in 2019, the state filed a petition for an order to extend the acquittee's commitment pursuant to the statute (§ 17a-593 (c)) that permits recommitment when there is reasonable cause to believe that the acquittee "remains a person with psychiatric disabilities . . . to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others . . . ." The acquittee moved to dismiss the state's petition on the ground that the recommitment procedure set forth in § 17a-593 (c) violated his right to equal protection under the United States constitution, but the trial court denied the acquittee's motion to dismiss, granted the state's petition, and extended the acquittee's commitment. In affirming the trial court's order extending commitment, the Appellate Court rejected the acquittee's claim that the recommitment procedure set forth in § 17a-593 (c) violated his right to equal protection and upheld the trial court's finding that the state had proven by clear and convincing evidence that the acquittee suffered from a mental illness that resulted in

1

State *v.* Foster

his being a danger to himself or others. On the granting of certification, the acquittee appealed to this court. *Held*:

The Appellate Court correctly concluded that the recommitment scheme contemplated by § 17a-593 (c) did not violate the acquittee's right to equal protection under the federal constitution.

The acquittee's equal protection claim was premised on the argument that, even though he is similarly situated to convicted inmates who, while already incarcerated, develop psychiatric conditions and are subsequently committed to mental health facilities pursuant to the statutes (§§ 17a-498 (c) and 17a-515) governing civil commitment, the recommitment procedure set forth in § 17a-593 (c) is applied more conservatively than the nominally identical procedure that applies to civilly committed inmates and that such disparate treatment did not withstand intermediate scrutiny.

The acquittee's equal protection claim failed because individuals, such as the acquittee, who are found not guilty by reason of mental disease or defect (insanity acquittees) and who have reached the end of their initial, maximum terms of commitment, are not similarly situated to civilly committed inmates for purposes of commitment.

Specifically, an insanity acquittee's commitment is the product of a judicial determination that the criminal acts that resulted in his commitment were the result of his mental illness, whereas a civilly committed inmate has not acknowledged that he suffers from a mental illness that caused him to engage in criminal conduct, and there is no connection between the civilly committed inmate's criminal behavior and his civil commitment, insofar as the inmate's mental illness and the associated danger to himself or others may develop years after the commencement of the inmate's sentence for his prior criminal behavior.

The Appellate Court properly upheld the trial court's finding under § 17a-593 (c) that there was reasonable cause to believe that the acquittee's discharge would constitute a danger to himself or others, as that finding was not clearly erroneous.

The offenses that led to the acquittee's prosecution, which involved the physical assault of two schoolchildren while the acquittee was experiencing auditory hallucinations, were violent in nature and indicated that his psychotic disorder could seriously endanger the safety of other people, it was appropriate for the trial court to consider the acquittee's offenses in making its determination of dangerousness, even though they occurred more than eighteen years before the state filed its petition for continued commitment in 2019, and, during his nearly two decades of commitment, the acquittee experienced numerous difficulties and forfeited various privileges as a result of engaging in inappropriate and impulsive behavior.

State *v.* Foster

In light of the length of the acquittee's commitment, this court placed particular emphasis on the acquittee's mental health status at or around the time that the state filed the 2019 petition, and, although the acquittee had demonstrated some progress toward recovery and had been granted conditional release during that time period, various medical professionals had expressed concern with the acquittee's discharge, given the short period of time during which he had demonstrated compliance while under supervised release, and the trial court properly credited the testimony of those professionals.

Moreover, the Psychiatric Security Review Board had noted that the acquittee continued to require substantial supervision while on conditional release, and it was appropriate for the trial court, in determining whether the acquittee posed a risk of danger, to consider the degree to which the acquittee's progress was the product of the services, structure, and support that he was receiving and what could potentially happen when the acquittee is no longer required to take medication, to attend counseling, or to have other restrictions in place that may remove potential stressors or triggers.

(*One justice concurring separately*)

Argued December 4, 2024—officially released August 19, 2025

*Procedural History*

Petition for an order extending the acquittee's commitment to the Psychiatric Security Review Board, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number one, where the court, *Hon. Richard F. Comerford, Jr.*, judge trial referee, denied the acquittee's motions to dismiss and to strike; thereafter, the case was tried to the court, *Hon. Richard F. Comerford, Jr.*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment granting the petition, from which the acquittee appealed to the Appellate Court, *Cradle* and *Suarez, Js.*, with *Seeley, J.*, concurring, which affirmed the trial court's judgment, and the acquittee, on the granting of certification, appealed to this court. *Affirmed.*

*Monte P. Radler*, with whom was *Kevin Semataska*, assistant public defender, for the appellant (acquittee).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, were *Paul J. Ferencek*, state's attor-

State *v.* Foster

ney, and *Elizabeth K. Moran*, assistant state's attorney, for the appellee (state).

*Deborah A. Dorfman* filed a brief for Disability Rights Connecticut as amicus curiae.

*Opinion*

MULLINS, C. J. The principal issue in this certified appeal is whether, for purposes of an equal protection challenge, an insanity acquittee[1] who is subject to a petition under General Statutes § 17a-593[2] for continued commitment to the custody of the Psychiatric Security Review Board (board) following the expiration of the maximum period of commitment is similarly situated to a mentally ill prison inmate who is the subject of a petition for civil commitment pursuant to General Statutes §§ 17a-498 (c) and 17a-515 (civilly committed inmate). We conclude that an insanity acquittee who is subject to a petition for continued commitment, regardless of his clinical progress, is not similarly situated to a civilly committed inmate for purposes of the equal protection guarantees under the fourteenth amendment to the United States constitution.

The acquittee, Franklin Foster, appeals, upon our grant of his petition for certification,[3] from the judgment

---

[1] "An insanity acquittee is any person found not guilty by reason of mental disease or defect . . . ." (Internal quotation marks omitted.) *State* v. *Dyous*, 307 Conn. 299, 301 n.1, 53 A.3d 153 (2012); see also General Statutes § 17a-580 (1).

[2] The legislature amended subsection (g) of § 17a-593 since the events underlying this appeal. See Public Acts 2022, No. 22-45, § 5; see also part I A of this opinion. All references herein to § 17a-593 are to the current revision of the statute unless otherwise indicated.

[3] This court granted the acquittee's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the trial court's factual finding that the acquittee poses a continued risk of danger to himself or to others was supported by clear and convincing evidence?" (2) "Did the Appellate Court correctly conclude that the acquittee was not similarly situated to civilly committed inmates for the purpose of deciding whether . . . § 17a-593, as applied to the acquittee, violated his right to equal protection under the fourteenth amendment to the United States constitution?" And (3) "[i]f the answer to the second question is 'no,'

State *v.* Foster

of the Appellate Court, which affirmed the judgment
of the trial court granting the state's petition to extend
his commitment to the custody of the board. See *State*
v. *Foster*, 217 Conn. App. 476, 478, 506, 289 A.3d 191
(2023). On appeal, the acquittee claims, among other
things, that the Appellate Court incorrectly concluded
that (1) as an insanity acquittee, he was not similarly
situated to a civilly committed inmate for purposes of
a challenge to § 17a-593 under the equal protection
clause of the fourteenth amendment to the United
States constitution, and (2) the trial court's finding,
pursuant to § 17a-593 (c), that he was mentally ill and
dangerous was supported by clear and convincing evi-
dence.[4] We disagree and affirm the judgment of the
Appellate Court.

is § 17a-593 subject to rational basis review or to intermediate scrutiny?''
*State* v. *Foster*, 346 Conn. 920, 291 A.3d 1041 (2023).

Because we conclude that the answer to question two is ''yes,'' we do
not address the third certified issue.

[4] In his brief to this court, the acquittee also asserts two other constitu-
tional claims. First, as a corollary to his claim that the Appellate Court
improperly upheld the trial court's finding of dangerousness, the acquittee
contends that § 17a-593 is unconstitutionally vague under the Connecticut
constitution because the statutory scheme does not provide concrete stan-
dards for assessing an insanity acquittee's future dangerousness. Second,
the acquittee claims that § 17a-593 violates his equal protection rights under
the Connecticut constitution and provides an independent analysis under
*State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), in support of
his argument that the state constitution provides him with greater protection
than the federal constitution.

We decline to address these state constitutional claims because, as the
state points out, the acquittee abandoned them by not raising them before
the Appellate Court, which never decided the issues, and because they are
outside the scope of the certified issues, limiting our review of the Appellate
Court's decision. See, e.g., *Dept. of Public Health* v. *Estrada*, 349 Conn. 223,
250, 315 A.3d 1081 (2024); see also, e.g., Practice Book (2023) § 84-9 (limiting
issues appellant can present on appeal to ''those set forth in the petition
for certification, except where the issues are further limited by the order
granting certification''); *State* v. *Saucier*, 283 Conn. 207, 223, 926 A.2d 633
(2007) (''a claim that has been abandoned during the initial appeal to the
Appellate Court cannot subsequently be resurrected by the taking of a
certified appeal to this court'' (internal quotation marks omitted)). Further,
we disagree with the acquittee's argument that the present case presents

State *v.* Foster

The record reveals the following relevant facts and procedural history, many of which are aptly set forth in greater detail in the opinion of the Appellate Court. See id., 478–82. In 2001, when he was twenty-four years old, the acquittee entered a Greenwich middle school without permission. Id., 478–79. The acquittee possessed two knives; unprovoked, he punched, slapped and kicked a male student and lifted a female student over his head. Id. When apprehended, the acquittee told the police: "I'm here to fight the first person I see. Both of us were in the wrong place at the wrong time." (Internal quotation marks omitted.) Id., 479. "[D]uring the incident at issue, the acquittee was responding to command auditory hallucinations that told him to assault a minor." (Internal quotation marks omitted.) Id., 479 n.1. The acquittee was found not guilty by reason of a mental disease or defect of several index offenses,[5] namely, burglary in the first degree, risk of injury to a child, assault in the third degree, and possession of a weapon on school grounds. Id., 478. The acquittee was subsequently diagnosed with, and continues to experience, schizophrenia or bipolar schizoaffective disorder, as well as borderline intellectual functioning.

Following his insanity acquittal, the acquittee was initially committed in 2003 "to the jurisdiction of the

considerations of judicial economy similar to those present in *State* v. *Andres C.*, 349 Conn. 300, 315 A.3d 1014, cert. denied,    U.S.   , 145 S. Ct. 602, 220 L. Ed. 2d 236 (2024), a certified appeal in which we exercised our discretion to review the state's unpreserved, alternative ground for affirmance. See id., 305–306, 315–18 (considering whether sexual assault victim's journals were disclosable statements under rules of practice because, if defendant prevailed in certified appeal and obtained remand for further proceedings, state could raise that claim at that time).

[5] As the Appellate Court observed, "[t]he psychiatric profession refers to the offenses that led to an acquittee's arrest as 'index offenses.' " *State* v. *Foster*, supra, 217 Conn. App. 487 n.5; see, e.g., M. Kaggwa et al., "Weapon Use During the Index Offense: A Study Among Forensic Psychiatry Patients in Ontario, Canada," 11 Inj. Epidemiology, December 18, 2024, p. 2, available at https://link.springer.com/content/pdf/10.1186/s40621-024-00551-z.pdf (last visited August 13, 2025).

State *v.* Foster

board for a period of time not to exceed ten years, and [he] was subsequently admitted to a psychiatric hospital. By agreement of the parties, the acquittee's commitment was continued by the [trial] court for one year in 2013, two years in 2014, two years in 2016, and one year in 2018.'' Id., 479.

With respect to the nature of his commitment, the acquittee was initially confined under maximum security conditions for four years at what was then the Whiting Forensic Division of the Connecticut Valley Hospital (hospital) in Middletown, from June, 2003, until August, 2007. In August, 2007, the board approved the transfer of the acquittee to the hospital's less restrictive Dutcher Enhanced Security Service (Dutcher). The acquittee began to attend day treatment services in Bridgeport in March, 2012, but resided at the hospital until August, 2013. He then moved to a community outpatient setting until December, 2013, when he was required to return to the hospital because of ''inappropriate behavior.''

In May, 2014, the board terminated the acquittee's overnight leave but continued to permit him to attend day treatment in the community while residing at Dutcher. That privilege was suspended briefly after the acquittee assaulted another patient in November, 2014, injuring himself but not the other patient.

In 2015, the acquittee underwent neuropsychological testing, which revealed ''poor frustration tolerance'' and impulsivity. Kevin Trueblood, a forensic psychiatrist, described him as ''angry and rigid'' in response to clinical staff, particularly female staff who exercised authority over him. Trueblood reported that the acquittee had exhibited some insight into his index offenses and mental illnesses but was ''not likely to make much more improvement'' in that respect. In a 2016 report, the board indicated that it agreed with Trueblood's concern

State *v.* Foster

that, if discharged, the acquittee would become non-compliant with treatment and dangerous.

In 2016 and 2017, the acquittee threatened female hospital staff on multiple occasions, which resulted in the board's decreasing his leave privileges. On one of those occasions, the acquittee blocked a female staff member from exiting a small storage room in a way that left her feeling "barricaded" in that space. On a second occasion, after a staff member tried to "redirect" the acquittee following an incident with another patient in the dining room, he called that staff member "a derogatory curse word." He then disobeyed staff direction to remain where he was and told a female member that he should " 'slap her for being a snitch.' " On a third occasion, the acquittee told the same female staff member from the storage room incident that he was "out to get [her]."

In September, 2017, the acquittee began to show progress, and the board granted him temporary leave to transition to a residential program in Bridgeport. Trueblood testified that, by that time, the acquittee had denied experiencing any hallucinations or thoughts of harming himself or others and that "[h]is thinking appeared to be organized and goal-directed." As a result, the board granted the acquittee overnight stays at the transitional living center. At the center, the acquittee demonstrated progress, which the board attributed to "a high degree of supervision and support."

After nearly one year of clinical stability and compliance with taking his medication, in the summer of 2018, "the acquittee was granted conditional release, at which time he was discharged from the hospital and began living in the community. His release in the community was conditioned [on] his compliance with several requirements pertaining to his ongoing mental health treatment." *State* v. *Foster*, supra, 217 Conn. App. 479.

State *v.* Foster

He has continued living in Bridgeport following his transition to conditional release.

The state filed the petition for continued commitment at issue in this certified appeal in July, 2019. Id. In August, 2019, the board filed a report pursuant to § 17a-593 (d), recommending that the trial court extend the acquittee's commitment for a period of time not to exceed five years. See id., 480. In making this recommendation, the board emphasized that the acquittee had "a long-standing pattern of inappropriate and impulsive behaviors, which he usually exhibited when frustrated," along with a history of noncompliance with taking his medication. The board noted that, as recently as June 29, 2018, Alexander Westphal, a consulting forensic psychiatrist, had testified in favor of conditionally releasing the acquittee from the hospital to the community. Westphal acknowledged, however, that the acquittee "would pose a risk to himself or others without the substantial conditions proposed for his release."

Given that the acquittee had been on conditional release status for only approximately one year when the state filed its petition for continued commitment, the board emphasized that his "experience living in the community remain[ed] limited and [that] he [was] stable only because of substantial supervision and support, including daily monitored medication; a structured residential program with [forty] hours of mandated programming a week; limited travel in his own custody, in [six] hour increments; and weekly meetings with an individual therapist and conditional release supervisor. Without these mandated safeguards, which his treaters continue[d] to believe [were] required to address his risk, he [was] likely to become noncompliant with treatment and medication, increasing his risk to himself and the community. Given that he would no longer be subject to the safeguards if discharged from the board and that he was only released from hospital confine-

State *v.* Foster

ment during the past year and had not before that resided independently in the community since 2001, the board [found] that he continue[d] to require substantial supervision and that he [could not] reside safely in the community without the board's continued oversight and support.''

The acquittee moved to dismiss the state's petition for continued commitment on the ground that the recommitment procedure under § 17a-593 violated his equal protection rights under the United States constitution, and he later moved to strike the portion of the board's report recommending the extension of his commitment. See *State* v. *Foster*, supra, 217 Conn. App. 479–81.

The trial court held a hearing on the motions and the petition. Id., 481. The court denied the acquittee's motions and subsequently issued a memorandum of decision, granting the state's petition and extending the acquittee's commitment for two years. Id. The court found that the state had established by clear and convincing evidence that the acquittee continues to suffer from (1) ''a psychiatric illness diagnosed as schizoaffective disorder, bipolar type,'' (2) ''borderline intellectual functioning,'' (3) ''inappropriate and impulsive behaviors, especially toward females,'' and (4) ''frustration difficulties.''

The trial court further found that, although the acquittee's ''record indicates progress, his current release into the community is stable because of substantial supervision and support. These mandated safeguards and supervision, including a required pharmaceutical regime, are necessary to avoid increasing his risk to himself and the community. [Although the acquittee] has expressed . . . to [his conditional release supervisor, Madeline Rodriguez, who is a licensed clinical social worker, an intent] to voluntarily comply with

State *v.* Foster

mandated safeguards, a sufficient period of time in conditional release status has not passed for the [trial] court to give great weight to any such self-represented intent. [On the basis of] the reliable and probative evidence, the significant nature of the underlying criminal behavior, and the history of [the acquittee], the court finds that he cannot reside in the community without [the board's] continued oversight and support." The trial court later extended that two year commitment to December 1, 2025. See footnote 7 of this opinion.

In March, 2020, the acquittee appealed from the judgment of the trial court to the Appellate Court. *State* v. *Foster*, supra, 217 Conn. App. 481. He first claimed that the trial court "improperly found that the state had proven by clear and convincing evidence that he suffered from a mental illness resulting in his being a danger to himself or others." Id., 482. The Appellate Court rejected this claim. See id. The Appellate Court concluded that the trial court's finding of dangerousness was not clearly erroneous because (1) "during his commitment to the board, the acquittee had made progress and . . . the current level of his release into the community is 'stable' only because of mandated safeguards imposed by the board"; id., 493; and (2) despite the acquittee's expressed intention "to voluntarily comply with mandated safeguards," the record did not establish "a sufficient history of [the acquittee] being in a conditional release status to support a conclusion that he can live in the community without board oversight." Id., 494.

The acquittee's second claim on appeal was that "§ 17a-593, as applied to him, violates his right to equal protection [as] guaranteed by the federal constitution." Id. He contended that "the recommitment procedure that governs acquittees under § 17a-593 is applied more conservatively than the nominally identical commitment procedure that applies to [civilly committed

State *v.* Foster

inmates] under § 17a-515, that acquittees are similarly situated to civilly committed inmates for purposes of equal protection analysis, that an intermediate level of scrutiny should be utilized in an equal protection analysis of § 17a-593, and that § 17a-593 cannot withstand such scrutiny." Id., 495. After conducting a comprehensive review of prior decisions from appellate courts that have considered constitutional challenges to § 17a-593, including this court's decisions in *State* v. *Dyous*, 307 Conn. 299, 53 A.3d 153 (2012), and *State* v. *Metz*, 230 Conn. 400, 645 A.2d 965 (1994), the Appellate Court rejected the acquittee's equal protection claim, concluding that he could not establish as a threshold matter that, as an insanity acquittee, he was similarly situated to civilly committed inmates.[6] See *State* v. *Foster*, supra, 217 Conn. App. 498–506. Accordingly, the Appellate Court affirmed the judgment of the trial court. Id., 506. This certified appeal followed.[7]

I

We begin with the principal issue in this appeal, which is the acquittee's claim that the recommitment scheme

[6] Judge Seeley authored a concurring opinion, stating that she would have resolved the acquittee's equal protection claims by "follow[ing] the [well-traveled] analytical path established by prior decisions of [this court] and [the Appellate Court] and [by] assum[ing], without deciding, that the acquittee is similarly situated to civilly committed inmates for purposes of the equal protection analysis." *State* v. *Foster*, supra, 217 Conn. App. 507–508 (*Seeley, J.*, concurring); see, e.g., *State* v. *Dyous*, supra, 307 Conn. 316 and n.11. Judge Seeley also concluded that she was bound by this court's decision in *State* v. *Long*, 268 Conn. 508, 535–36, 539–40, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004), "to apply rational basis review to the acquittee's claim of disparate treatment in statutory recommitment procedures for acquittees as compared to civilly committed inmates." *State* v. *Foster*, supra, 528 (*Seeley, J.*, concurring). She ultimately concluded that the acquittee's claim failed because he did not "adequately brief the claim that his right to equal protection had been violated under rational basis review." Id., 528–29 (*Seeley, J.*, concurring).

[7] The acquittee's two year commitment, which would have expired on December 23, 2021, has been extended several times, with the agreement of the parties, throughout the course of these appeals: first to March 21, 2023, then to September 1, 2025, and, finally, to December 1, 2025. The

State *v.* Foster

under § 17a-593 violates his equal protection rights under the United States constitution. He first contends that the Appellate Court incorrectly concluded that, as an insanity acquittee who is subject to recommitment following the completion of his initial maximum term of commitment pursuant to *State* v. *Metz*, supra, 230 Conn. 424–25, he is not similarly situated to a civilly committed inmate. The acquittee argues that he is "even better situated" than a civilly committed inmate because he has had "years of medication, treatment, and successful community integration" and that he should not be perpetually saddled with his index offenses, which "reflected his mental state at its worst moment." The acquittee further claims that § 17a-593 is subject to intermediate scrutiny for purposes of analysis under the equal protection clause and that the statute fails under that standard because the differential treatment is not substantially related to an important governmental interest. See, e.g., *State* v. *Dyous*, supra, 307 Conn. 318; see also, e.g., *Craig* v. *Boren*, 429 U.S. 190, 197, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976).

We conclude that the acquittee's equal protection claim fails because, as an insanity acquittee, even one whose initial maximum term of commitment has expired, he is not similarly situated to a civilly committed inmate. Primarily, there is a fundamental distinction between the two classes because, in contrast to a civilly committed inmate's commitment, an insanity acquittee's commitment is the product of a judicially determined connection between the index offense and the insanity acquittee's mental illness.

A

Review of Governing Statutory Scheme

An overview of Connecticut's statutory scheme governing the recommitment of insanity acquittees, along

acquittee continues to reside in Bridgeport on conditional release pending a decision from this court.

State *v.* Foster

with a comparison to that governing civil commitment, provides context for understanding the acquittee's claims on appeal. This court's decision in *State* v. *Dyous*, supra, 307 Conn. 299, explains the two statutory schemes. There are "key disparities between the system applicable to insanity acquittees and the system applicable to civilly committed inmates. These disparities cause the system applicable to insanity acquittees to tilt more strongly toward confinement. In the most general terms, the system applicable to insanity acquittees, which is administered by the board and the Superior Court, operates such that its primary purpose is to protect the public, whereas the system applicable to civilly committed inmates, which is administered by mental health facilities and the Probate Court, operates such that a paramount concern is to protect a defendant's liberty." Id., 322–23.

"[T]he most obvious reason why divergent outcomes of this sort are possible is that the legislature has imposed different mandates on the two commitment systems." Id., 323. "[F]or acquittees, the legislature has directed the board, in making decisions regarding conditional release, and the Superior Court, in making decisions regarding discharge, to consider that [the] primary concern is the protection of society . . . . General Statutes §§ [17a-584] and 17a-593 (g). In civil commitment proceedings, however, the legislature has directed physicians providing opinions to the Probate Court to consider whether . . . less restrictive placement is recommended and available; General Statutes § 17a-498 (c); and similarly has required the Probate Court to consider whether . . . a less restrictive placement is available . . . . General Statutes § 17a-498 (c)." (Internal quotation marks omitted.) *State* v. *Dyous*, supra, 307 Conn. 323; see also, e.g., *State* v. *Harris*, 277 Conn. 378, 382–85, 890 A.2d 559 (2006) (contrasting civil commitment and insanity acquittee recommittal proce-

State *v.* Foster

dures). Finally, in 2022, the legislature amended § 17a-593 (g) to make clear that the trial court's "secondary concern is the safety and well-being of the acquittee . . . ." Public Acts 2022, No. 22-45, § 5 (P.A. 22-45).

This court's 1994 decision in *State* v. *Metz*, supra, 230 Conn. 400, clarified the burden of proof applicable in acquittees' recommitment proceedings. In *Metz*, this court "conclude[d] that § 17a-593 (c) impliedly imposes the same burden [of proof] on the state at a hearing for the continued commitment of an acquittee beyond his [or her] current definite period of commitment as is imposed in a civil commitment hearing under § 17a-498 (c); namely, to show by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself or herself or others or gravely disabled." Id., 425.

B

General Equal Protection Principles

The following well established principles govern our review of the acquittee's federal equal protection claims, which present "a question of law over which our review is plenary. . . . [T]he concept of equal protection [under the federal constitution] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. . . . Conversely, the equal protection clause places no restrictions on the state's authority to treat dissimilar persons in a dissimilar manner. . . . Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state statute . . . in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . [Accordingly], the analytical predicate [of an equal protection claim] is a determination of who are the persons [purporting to be] similarly situated. . . . The similarly situated inquiry focuses on whether the [challenger is]

State *v.* Foster

similarly situated to another group for purposes of the challenged government action.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Dyous*, supra, 307 Conn. 315.

''Thus, [t]his initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged. . . . Entities are situated similarly in all relevant aspects if a prudent person, looking objectively at the incidents, would [deem] them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the relevant aspects are those factual elements [that] determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.'' (Citation omitted; internal quotation marks omitted.) Id., 315–16; see also, e.g., *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 140, 157–58, 957 A.2d 407 (2008) (applying equal protection analysis to state constitutional claim).

Establishing that the entities or individuals at issue are similarly situated is a ''threshold requirement''; (internal quotation marks omitted) *Keane* v. *Fischetti*, 300 Conn. 395, 403, 13 A.3d 1089 (2011); or ''analytical predicate'' to the equal protection analysis that we apply under both the federal and state constitutions. (Internal quotation marks omitted.) *State* v. *Wright*, 246 Conn. 132, 139, 716 A.2d 870 (1998); see, e.g., *Ramos* v. *Vernon*, 254 Conn. 799, 826, 761 A.2d 705 (2000); see also, e.g., *Darak* v. *Darak*, 210 Conn. 462, 473, 556 A.2d 145 (1989) (seminal Connecticut case on similarly situated analysis). Only after concluding that the entities or persons at issue are similarly situated does the court go on to determine the standard of review applicable to the equal protection analysis. See, e.g., *Keane* v. *Fischetti*, supra, 403–406; see also, e.g., *State* v. *Angel C.*, 245 Conn.

93, 126 and n.37, 715 A.2d 652 (1998). The three well established equal protection standards of review, ranging from most to least deferential to a challenged classification, are rational basis, intermediate scrutiny, and strict scrutiny. See, e.g., *State* v. *Dyous*, supra, 307 Conn. 317–18.

The statutory classification by itself cannot serve as the defining difference between the classes, i.e., that one group is named "acquittees" and the other "civil committees," with respect to establishing whether they are similarly situated. Factual differences, not just statutory distinctions, must exist to render the two groups not similarly situated. See, e.g., *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 162–63 (rejecting argument that gay persons are not similarly situated under state constitution to "persons who choose to marry a person of the opposite sex insofar as each of the plaintiffs [sought] to marry a person of the same sex," as "the plaintiffs [could] meet the same statutory eligibility requirements applicable to persons who seek to marry" person of opposite sex and had "multitude of characteristics" in common with opposite sex couples with respect to desire for marriage). In the present case, the threshold question that we must resolve is whether an insanity acquittee is similarly situated to a civilly committed inmate for purposes of considering an extension of commitment.

C

Similarly Situated Analysis

Highlighting his therapeutic progress during his term of commitment to the custody of the board, the acquittee seeks to classify himself as similarly situated to a civilly committed inmate because he is now subject to extensions of his since expired initial commitment pursuant to § 17a-593 (c), under the scheme set forth by *State* v. *Metz*, supra, 230 Conn. 424–25. We under-

State *v.* Foster

stand the class implicated by the acquittee's claim to include all of those insanity acquittees who benefit from the construction of § 17a-593 under *Metz* because their initial term of confinement has expired.[8] Although the acquittee casts this claim as an as applied challenge, this case presents a facial challenge to § 17a-593 as construed by *Metz* "because a determination in his favor necessarily would apply to the continued commitment of all other acquittees" of similar commitment status. *State* v. *Long*, 301 Conn. 216, 244, 19 A.3d 1242, cert.

---

[8] The acquittee's framing of the classes involved is not entirely clear. On the one hand, in his brief to this court, he refers to himself broadly as a "*Metz* acquittee" throughout the analysis and relies heavily on that decision's treatment of the limited initial term of commitment for purposes of the allocation of the burden of proof in recommitment proceedings. See *State* v. *Metz*, supra, 230 Conn. 424–26. On the other hand, he emphasizes his individual clinical progress and distinguishes himself factually from the insanity acquittee in this court's leading decision in *State* v. *Dyous*, supra, 307 Conn. 299. In *Dyous*, the insanity acquittee's clinical progress was less than that of the acquittee in this appeal, insofar as the acquittee in *Dyous* had absconded from two hospitals and had continued to experience hallucinations and delusions and to exhibit violent behavior and a general reluctance to take his prescribed medication. See id., 304–307. Indeed, the acquittee in the present case points out that the insanity acquittee in *Dyous* did not challenge the dangerousness finding in that case. See id., 314.

Given the innumerable variations in treatment progress by *Metz* acquittees, with some experiencing minimal or no clinical improvement, others experiencing clinical improvement over a relatively short period of time, and others experiencing a great deal of success over an extended period of time, we view any attempt to define a class based on an insanity acquittee's underlying clinical progress to suffer from fatal unworkability with respect to its identification. See, e.g., *Corey Airport Services, Inc.* v. *Clear Channel Outdoor, Inc.*, 682 F.3d 1293, 1297–98 (11th Cir. 2012) (discussing need for "strongly defined groupings," like race or gender, and noting that, "[f]or a group to qualify properly as identifiable for the purposes of an [e]qual [p]rotection [c]lause claim, substantive group characteristics must pop out that allow [the court] to separate readily entities or people into discrete groupings and clearly identify those persons [who] suffered the alleged discrimination and those persons [who] did not"). As discussed in part II of this opinion, the difficulty of this analysis is further compounded by the difficulty in teasing out the extent to which an acquittee's success is a product of the support and conditions that the acquittee receives because of his commitment to the custody of the board. Accordingly, our treatment of this claim encompasses all insanity acquittees who are subject to recommitment under *Metz*.

State *v.* Foster

denied, 565 U.S. 1084, 132 S. Ct. 827, 181 L. Ed. 2d 535 (2011) (*Long II*); see also, e.g., id., 244 n.20 ("the distinction between as applied and facial challenges has perplexed litigants, courts and commentators" because, "[o]n one hand, it can refer to the relief sought; on the other hand, it can distinguish the source of the disparate treatment—the text of the statute or those who interpret and apply that text").

Whether an insanity acquittee who has reached the end of his initial term of commitment is similarly situated to a civilly committed inmate for purposes of equal protection challenges under the United States constitution presents an issue of first impression for this court. When Connecticut's appellate courts have considered equal protection challenges to § 17a-593, they have generally assumed, without deciding, that insanity acquittees and civilly committed inmates are similarly situated and have then resolved the case on the merits under varying standards of review. See, e.g., *State* v. *Dyous*, supra, 307 Conn. 316 and n.11, 321–22; *State* v. *Long*, 268 Conn. 508, 535, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004) (*Long I*); *State* v. *Lindo*, 110 Conn. App. 418, 426–27, 955 A.2d 576, cert. denied, 289 Conn. 948, 960 A.2d 1038 (2008). But see *State* v. *Dyous*, supra, 336–39 (*Zarella, J.*, concurring) (resolving equal protection claim by concluding that insanity acquittees are not similarly situated to civilly committed inmates because, as explained by *Jones* v. *United States*, 463 U.S. 354, 367, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983), "insanity acquittees and those who are civilly committed are distinguishable on . . . a fundamental level," given fact that insanity acquittee "has been declared dangerous to society due to the commission of a criminal act . . . which is not the case with a civilly committed inmate whose mental disease or defect was not accompanied by a criminal act").[9]

_____

[9] The majority in *Dyous* responded to Justice Zarella's concurrence in a footnote, describing the similarly situated issue as not "nearly so [clear-cut]

State *v.* Foster

"The similarly situated analysis is not a precise formula, but . . . what is clear is that similarly situated [comparators] must be very similar indeed. . . . This is true because the [e]qual [p]rotection [c]lause does not require things which are different in fact or opinion to be treated in law as though they [are] the same." (Citations omitted; internal quotation marks omitted.) *Monarch Beverage Co.* v. *Grubb*, 138 F. Supp. 3d 1002, 1008 (S.D. Ind. 2015), aff'd sub nom. *Monarch Beverage Co.* v. *Cook*, 861 F.3d 678 (7th Cir. 2017).

In turning to state and federal case law that has considered whether insanity acquittees and those who are committed under civil proceedings—including civilly committed inmates—are similarly situated, we begin with the broad language in the United States Supreme Court's decision in *Jones* v. *United States*, supra, 463 U.S. 354. In *Jones*, the court considered whether an insanity acquittee "must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted." Id., 356. This question arose in the context of a statutory scheme providing for indefinite and automatic commitment of insanity acquittees, with hearings to consider release held every six months thereafter. See id., 356–58 and n.2, 361.

In rejecting the challenge, the United States Supreme Court held broadly that, "when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the [federal] [c]onstitution permits the [g]overnment, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity

in light of the important features that the two groups have in common." *State* v. *Dyous*, supra, 307 Conn. 316 n.11. The *Dyous* majority believed that *Jones* v. *United States*, supra, 463 U.S. 370, did not "[provide] guidance with respect to this issue," describing it as "merely determin[ing] that the distinctions between the two classes were sufficient to warrant differential treatment . . . ." (Citation omitted.) *State* v. *Dyous*, supra, 316 n.11. The majority observed that "[i]t may be argued, therefore, that *Jones* supports

State *v.* Foster

or is no longer a danger to himself or society. *This holding accords with the widely and reasonably held view that insanity acquittees constitute a special class that should be treated differently from other candidates for commitment.*"[10] (Emphasis added.) Id., 370; see id., 368 ("[t]he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous"); see also *Foucha* v. *Louisiana*, 504 U.S. 71, 85–86,

the view that the two classes *are* similarly situated for equal protection purposes" but stated that it did "not believe . . . that *Jones* sheds any real light on the issue." (Emphasis in original.) Id., 317 n.11. The majority did, however, "acknowledge that there is some persuasive force to the state's contention that the two groups actually are not similarly situated—only insanity acquittees necessarily were mentally ill at the time of their prior criminal conduct, for example, and only insanity acquittees were proven to have engaged in such conduct *because* they were mentally ill . . . ." (Emphasis in original.) Id., 316.

[10] The United States Supreme Court in *Jones* addressed due process principles in rejecting the insanity acquittee's due process claim that "indefinite commitment is unconstitutional because the proof of his insanity was based only on a preponderance of the evidence, as compared to [the civil commitment] requirement of proof by clear and convincing evidence" under *Addington* v. *Texas*, 441 U.S. 418, 426–27, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). *Jones* v. *United States*, supra, 463 U.S. 366–68. The court observed that, "[i]n equating these situations, [the insanity acquittee] ignore[d] important differences between the class of potential [civil commitment] candidates and the class of insanity acquittees that justify differing standards of proof. The [court in] *Addington* . . . expressed particular concern that members of the public could be confined on the basis of 'some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.' . . . In view of this concern, the [c]ourt [in *Addington*] deemed it inappropriate to ask the individual 'to share equally with society the risk of error.' . . . But [because] automatic commitment . . . follows only if the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness, there is good reason for diminished concern as to the risk of error. More important, the proof that [the acquittee] committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere 'idiosyncratic behavior' . . . . A criminal act by definition is not 'within a range of conduct that is generally acceptable.' " (Citations omitted; emphasis in original; footnotes omitted.) Id., 367. The court concluded that "concerns critical to [its] decision in *Addington* are diminished or absent in the case of insanity acquittees. Accordingly, there is no reason for adopting the same standard of proof in both cases." Id.; see id., 368 ("[t]he preponderance of the evidence standard comports with due process for commitment of insanity acquittees").

State *v.* Foster

112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (concluding that insanity acquittee who state conceded was not mentally ill was entitled to release because "*Jones* established that insanity acquittees may be treated differently in some respects from those persons subject to civil commitment").

Although the court in *Jones* stated that it was not considering the constitutionality of the differences between the release procedures in that case as applicable to insanity acquittees and civilly committed inmates; see *Jones* v. *United States*, supra, 463 U.S. 363 n.11; numerous state and federal courts have applied *Jones*' expansive language in holding that civil committees and insanity acquittees are not similarly situated for purposes of release. Notably, in *Glatz* v. *Kort*, 807 F.2d 1514 (10th Cir. 1986), the United States Court of Appeals for the Tenth Circuit rejected a facial challenge to Colorado's insanity acquittee release statutes, holding that "[i]nsanity acquittees and involuntary civil committees are *not* similarly situated groups for equal protection purposes." (Emphasis added.) Id., 1522. The court emphasized that "the insanity acquittee has confessed to committing a criminal act earlier and the grand jury or the court has found probable cause to believe that he did in fact commit the act," which renders it "not unreasonable to conclude that an insanity acquittal supports an inference of continuing mental illness. . . . These differences dramatically distinguish the involuntary civil committee and make an equal protection comparison inappropriate. They provide a rational basis for distinguishing the criminal committee [that] permits the state to commit the criminal defendant automatically, without the right to a [precommitment] hearing, *and permits a different burden and standard of proof for release.*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id.

State *v.* Foster

Numerous other federal and state decisions are consistent with the reasoning of *Glatz*, holding that the different origins of their commitments—and particularly the insanity acquittees' commission of criminal acts—render insanity acquittees and civilly committed individuals not similarly situated for purposes of release. See, e.g., *Hartman* v. *Summers*, 878 F. Supp. 1335, 1345–47 (C.D. Cal. 1995), aff'd, 120 F.3d 157 (9th Cir. 1997); *People* v. *Wilder*, 33 Cal. App. 4th 90, 104–105, 39 Cal. Rptr. 2d 247 (1995); *Lidberg* v. *Steffen*, 514 N.W.2d 779, 784 (Minn. 1994); *Reiter* v. *State*, 36 P.3d 586, 594–96 (Wyo. 2001); see also, e.g., *Ernst J.* v. *Stone*, 452 F.3d 186, 201 (2d Cir. 2006) (observing that, "[i]n the absence of any direct guidance from the [United States] Supreme Court regarding whether its analysis in *Jones* extends to recommitment proceedings, one could argue that because [civilly committed inmates]" have not "acknowledged that they suffer from mental illness" that "caused them to engage in criminal conduct," they "are not [similarly situated] to [conditionally released insanity acquittees] and therefore may be subjected to lower standards of proof in recommitment proceedings"); cf. *Warren* v. *Harvey*, 632 F.2d 925, 928, 930–32 (2d Cir.) (rejecting due process challenge to previous Connecticut statute requiring state to prove dangerousness at insanity acquittee release hearing by preponderance of evidence because "[t]he obvious difference between insanity acquittees and other persons facing commitment is the fact that the former have been found, beyond a reasonable doubt, to have committed a criminal act" and "have 'proved' themselves a danger to society at one time," whereas nonacquittees "have not been found by any [fact finder] to have harmed society as a result of their mental illness"), cert. denied, 449 U.S. 902, 101 S. Ct. 273, 66 L. Ed. 2d 133 (1980).

The acquittee contends, however, that the United States Supreme Court has "issued three seminal equal

State *v.* Foster

protection rulings regarding involuntary commitment,'' namely, *Jackson* v. *Indiana*, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972), *Humphrey* v. *Cady*, 405 U.S. 504, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972), and *Baxstrom* v. *Herold*, 383 U.S. 107, 86 S. Ct. 760, 15 L. Ed. 2d 620 (1966). He quotes the decision of the District of Columbia Circuit Court of Appeals in *United States* v. *Ecker*, 543 F.2d 178, 197 n.74 (D.C. Cir. 1976), cert. denied, 429 U.S. 1063, 97 S. Ct. 788, 50 L. Ed. 2d 779 (1977), to argue that the *Jackson/Humphrey/Baxstrom* ''trio of cases has produced the *Baxstrom* principle, which states that the [s]tate cannot withhold from a few the procedural protections or the substantive requirements for commitment [or release] that are available to all [other civil committees].'' (Internal quotation marks omitted.) Citing footnote 34 in *Ecker*, the acquittee also contends that ''[t]he *Baxstrom* principle applies equally to acquittees who reach the maximum sentence for the underlying index offense(s).'' See *United States* v. *Ecker*, supra, 188 n.34 (''equal protection requires [that] the standards governing the release of criminal [acquittees], who have been confined for a period equal to the maximum sentence authorized for their crimes, to be substantially the same as the standards applicable to civil committees'').

We disagree with the acquittee's reading of the *Jackson*, *Humphrey* and *Baxstrom* decisions. As *Jones* recognized, none of these United States Supreme Court cases concerned an insanity acquittee. See *Jones* v. *United States*, supra, 463 U.S. 369 n.19. Moreover, all three decisions, as well as the District of Columbia Circuit's decision in *Ecker*, predated *Jones*.[11] See, e.g.,

---

[11] The acquittee also argues that *Jones* is not controlling because it was a due process, rather than an equal protection, case. We disagree. The United States Supreme Court described the equal protection claim advanced by the insanity acquittee in the lower court in *Jones*, that ''it was irrational for the [g]overnment to deny him a [civil commitment] hearing at which the [g]overnment bore the burden of proof by clear and convincing evidence,'' as ''essentially duplicat[ing] [his] due process argument. That is, if the [d]ue

State *v.* Foster

*Seeboth* v. *Allenby*, 789 F.3d 1099, 1106 (9th Cir. 2015) (concluding that, contrary to claim by sexually violent predator, "*Baxstrom* did not sweep so broadly" to establish "that, in the arena of involuntary civil commitment, a state may not deny a right to one group of committed persons that it confers on another group of committed persons"), cert. denied sub nom. *Seeboth* v. *Ahlin*, 577 U.S. 1147, 136 S. Ct. 1168, 194 L. Ed. 2d 190 (2016); *Francis S.* v. *Stone*, 221 F.3d 100, 113 (2d Cir. 2000) (concluding that "*Baxstrom* [was] not decisive" in insanity acquittee case because "[the petitioner in *Baxstrom*] had never been adjudicated mentally ill based on his own plea; he was a prisoner [who] prison authorities had administratively determined should be confined in a prison hospital"); see also, e.g., T. Hafemeister & J. Petrila, "Treating the Mentally Disordered Offender: Society's Uncertain, Conflicted, and Changing Views," 21 Fla. St. U. L. Rev. 729, 743–44 (1994) ("Led by the United States Supreme Court, the courts have reversed their earlier position which had suggested that all [mental] patients were equal. Instead, it is now apparent that disparate rules governing the confinement of [insanity acquittees] are permissible." (Footnote omitted.)).

As this court concluded in *Long I* in rejecting a rational basis challenge, and consistent with federal case law in the wake of *Jones* v. *United States*, supra, 463 U.S. 363, 370, "unlike a civilly committed inmate, an acquittee has proven to the fact finder that his mental disease or defect caused him to commit a crime, thereby

[p]rocess [c]lause does not require that an insanity acquittee be given the particular procedural safeguards provided in a [civil commitment] hearing under *Addington* [v. *Texas*, 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)], then there necessarily is a rational basis for equal protection purposes for distinguishing between civil commitment and commitment of insanity acquittees." *Jones* v. *United States*, supra, 463 U.S. 362 n.10; see also *Foucha* v. *Louisiana*, supra, 504 U.S. 84–85 (describing equal protection aspects of *Jones*).

State *v.* Foster

establishing a legal nexus between the acquittee's mental illness and the criminal act.'' *State* v. *Long*, supra, 268 Conn. 540. There is no such inextricable connection between criminal behavior and civil commitment. In the case of a civilly committed inmate, the inmate's mental illness and the associated danger to himself or others may develop many years after the commencement of the inmate's sentence for a criminal conviction arising from conduct that has no connection at all to the inmate's mental illness. In this respect, a civilly committed inmate is no different from any other civilly committed individual, other than the role of the Department of Correction in the custody of that individual before and after his commitment to the custody of the Commissioner of Mental Health and Addiction Services for psychiatric treatment. See General Statutes § 17a-515 (''[t]he provisions of section 17a-498 shall apply to any person regarding whom proceedings for commitment are being instituted under section 17a-513 or 17a-514, and to any other person in the custody of the Commissioner of Correction, except that if the court revokes the order of commitment, the person shall be returned to any institution administered by the Department of Correction as the Commissioner of Correction shall designate, unless his custody in the Commissioner of Correction has terminated, in which case he shall be discharged'').

Accordingly, we are persuaded that the distinctions between insanity acquittees and civilly committed inmates render these groups not fair congeners. Fundamentally, the fact that insanity acquittees' mental illnesses have been proven to lead to criminal activity sufficiently distinguishes that group from civilly committed inmates for purposes of commitment. In other words, because the groups are postured differently, the law does not demand that they be treated the same. Thus, we con-

State *v.* Foster

clude that the acquittee is not similarly situated to a civilly committed inmate for equal protection purposes.

Although we do not review the acquittee's state constitutional argument; see footnote 4 of this opinion; we address his reliance on *State* v. *Metz*, supra, 230 Conn. 424–25, to the extent that it bears on our conclusion that the acquittee is not similarly situated to a civilly committed inmate. The acquittee asserts that to do otherwise would "[impose] the never-ending presumption of dangerousness that *Metz* forbids." We can see the surface level appeal of this reliance on *Metz*, but we ultimately disagree with the acquittee's argument.

In considering the equal protection challenge to § 17a-593 (c) that was raised in *Metz*, this court "construe[d] the statute so as not to place it in constitutional jeopardy." *State* v. *Metz*, supra, 230 Conn. 422–23. In doing so, the court determined that "the maximum period of commitment authorized by [General Statutes] § 17a-582 (e) (1) (A) [is] a reasonably identified point of demarcation beyond which the presumption of dangerousness initially accompanying an acquittee does not continue." Id., 425. Accordingly, the court "conclude[d] that § 17a-593 (c) impliedly imposes the same burden [of proof] on the state at a hearing for the continued commitment of an acquittee beyond his [or her] current definite period of commitment as is imposed in a civil commitment hearing under § 17a-498 (c); namely, to show by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself or herself or others or gravely disabled." Id.

In dictum, the court in *Metz* observed that its "conclusion finds additional support in the equal protection clause of our state constitution, which forbids discrimination on the ground of mental illness. If the defendant were not suffering from mental illness, the state could not constitutionally confine him beyond the maximum

State *v.* Foster

term of his criminal convictions. Although the state may well have a compelling interest in the continued commitment of acquittees whose mental illness[es] [make] them dangerous to themselves or others . . . that interest arises only when the state has shouldered the burden of establishing the existence of the underlying facts. . . . Because the underlying criminal conduct may be relatively minor, and indeed need not involve a crime of violence, the presumption of the existence of facts warranting the defendant's commitment does not survive the expiration of the maximum term of criminal sanctions.'' (Citations omitted.) Id., 425–26.

Although *Metz* provides some support for the acquittee's position, it is a statutory interpretation case that does not dictate whether insanity acquittees and civilly committed inmates are similarly situated as a matter of law, notwithstanding its dictum referring to the state equal protection clause. See *State* v. *Long*, supra, 268 Conn. 537 n.38. First, this court in *Metz* acknowledged the United States Supreme Court's recognition in *Jones* v. *United States*, supra, 463 U.S. 370, that insanity acquittees are "a special class that should be treated differently from other candidates for commitment''; (internal quotation marks omitted) *State* v. *Metz*, supra, 230 Conn. 414; but it did so in the context of background principles, and it did not squarely consider whether that observation informs release procedures. See id., 424–26. Indeed, in *Dyous*, this court critiqued *Metz* as inconsistent with a "commonsense conclusion that [insanity acquittees subject to recommitment] raise a public safety concern that is not raised to the same extent in the context of civilly committed inmates'' and that "[t]he special public safety concern . . . raised by the prospective release of [an insanity acquittee] does not evaporate the moment such a person reaches the end of his maximum term of commitment.'' *State* v. *Dyous*, supra,

State *v.* Foster

307 Conn. 331 n.18. Second, the dictum in *Metz* relying on the mention of mental disability in the state equal protection clause is unpersuasive. *Metz* was decided prior to *Rayhall* v. *Akim Co.*, 263 Conn. 328, 819 A.2d 803 (2003), which held that, "when the state discriminates *amongst* members of the protected class, invidious discrimination cannot necessarily be presumed." (Emphasis in original.) Id., 344. Accordingly, a legislative classification that differentiates between two classes of mentally disabled individuals, namely, insanity acquittees and civilly committed inmates, does not automatically receive heightened review, in contrast to those statutes that "[discriminate] *against* the disabled, or a class of the disabled, in favor of the able-bodied," under which invidious discrimination is presumed. (Emphasis in original.) Id.; see *State* v. *Long*, supra, 268 Conn. 539–40 (following *Rayhall* and applying rational basis review to challenge under state constitution because "acquittees and civilly committed inmates are both members of the same class, namely the psychiatrically disabled").

Although this court's conclusion in *State* v. *Metz*, supra, 230 Conn. 425, to apply the same burden of proof as between the two groups may have mitigated a due process issue given the liberty interest created by the maximum term of confinement under § 17a-582 (e) (1) (A), it does not render them similarly situated as a matter of law for purposes of a federal equal protection challenge to § 17a-593 (c).[12] The Appellate Court there-

_____

[12] Consistent with the public policy factor of *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992), the acquittee relies on scholarly literature, including articles cited in the amicus curiae brief of Disability Rights Connecticut, and on a legislative task force report to contend that fears of recidivism among insanity acquittees are inflated. The acquittee emphasizes that insanity acquittees, like himself, who have been treated with community support during the protracted reintegration process provided by the conditional release statutes; see General Statutes §§ 17a-588 through 17a-591; have significantly lower rates of reoffending than both offenders who are mentally ill and offenders who are not mentally ill. See, e.g., M. Norko et al., "Assessing Insanity Acquittee Recidivism in Connecticut," 34 Behav.

State *v.* Foster

fore correctly determined that the trial court properly denied the acquittee's motion to dismiss the state's petition for continued commitment. See *State* v. *Foster*, supra, 217 Conn. App. 494–95.

II

We next turn to the acquittee's claim that the Appellate Court incorrectly concluded that the trial court's factual finding that the acquittee poses a continued risk of danger to himself or others was supported by clear and convincing evidence. See id., 494. The acquittee claims that there is no evidence of his dangerousness, rendering the trial court's finding clearly erroneous. The acquittee contends that the trial court's "findings [did] not establish imminent danger and erroneously task[ed] [him] with establishing [that] he is ready for discharge," characterizing "[t]he evidence of potential dangerousness to children and/or women [as] particularly weak." Emphasizing "the temporal remoteness of the index offenses," the acquittee argues that he "has had success in his community placement and [has] made considerable progress toward discharge from the [board]," with "the record . . . devoid of evidence of

Sci. & L. 423, 439–40 (2016); R. Wise & D. Heinrich, "Toward a More Scientific Jurisprudence of Insanity," 95 Temp. L. Rev. 45, 70–72 (2022); see also, e.g., B. Wendzel, Note, "Not Guilty, Yet Continuously Confined: Reforming the Insanity Defense," 57 Am. Crim. L. Rev. 391, 405, 407 (2020). Given our conclusion that insanity acquittees and civilly committed inmates are not similarly situated for equal protection purposes, we need not engage in detail with the acquittee's public policy arguments, other than to observe that, following the release of a task force report in 2021; see Final Report of the Task Force To Review and Evaluate CVH and WFH, the Psychiatric Security Review Board, and Behavioral Health Care Definitions (December 16, 2021), available at https://www.cga.ct.gov/ph/tfs/20190426_CVH%20Whit ing%20Task%20Force/CVH%20Whiting%20Final%20Report.pdf (last visited August 13, 2025); legislative activity continues in this highly complex area, with the legislature recently amending § 17a-593 (g) to add the insanity acquittee's "safety and well-being" as a secondary consideration in the trial court's release decision. P.A. 22-45, § 5; see also, e.g., *State* v. *Lockhart*, 298 Conn. 537, 561–62, 4 A.3d 1176 (2010) (legislature is branch of government best suited to make public policy determinations).

State *v.* Foster

dangerous behavior . . . directed at schoolchildren, either on hospital grounds or in the community . . . .'' Criticizing the Appellate Court's decision as upholding impermissible speculation, the acquittee describes his conduct toward women in the hospital, about which the Appellate Court and trial court were concerned, as ''inappropriate relative to hospital or societal norms,'' but he contends that evidence of this conduct does not satisfy ''the [state's] heavy burden of establishing risk of imminent physical injury to a woman.'' We disagree and conclude that the Appellate Court properly upheld the trial court's finding that reasonable cause exists to believe that the acquittee's discharge would constitute a danger to himself or others.

As previously discussed, § 17a-593 governs proceedings to continue the commitment of an insanity acquittee to the custody of the board. Subsection (c) of the statute provides: ''If reasonable cause exists to believe that the acquittee remains *a person with psychiatric disabilities* or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment *would constitute a danger to himself or others*, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee.'' (Emphasis added.) In making the findings as to the acquittee's ''mental condition'' and as to whether his discharge would pose a danger to himself or others, the court's ''primary concern is the protection of society and its secondary concern is the safety and well-being of the acquittee . . . .'' General Statutes § 17a-593 (g); see P.A. 22-45, § 5 (amending § 17a-593 (g) to add acquittee's ''safety and well-being'' as ''secondary concern'').

Well established standards guide this court in making its determination under § 17a-593 (c) and (g). ''In [a] continued commitment proceeding, the state [bears]

State *v.* Foster

the burden of proving by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself . . . or others or gravely disabled. . . .

"[T]he confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not punishment for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and [to] protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness. . . .

"The determination as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged is a question of fact and, therefore, our review of this finding is governed by the clearly erroneous standard. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Damone*, 148 Conn. App. 137, 164–65, 83 A.3d 1227, cert. denied, 311 Conn. 936, 88 A.3d 550 (2014); see also, e.g., *State* v. *March*, 265 Conn. 697, 710–11, 830 A.2d 212 (2003); *State* v. *Metz*, supra, 230 Conn. 424–26. The trial court "properly" may "[credit] the board's opinion and rel[y] on its findings" in the report rendered pursuant to § 17a-593 (d) in making the dangerousness determination. *State* v. *March*, supra, 712.

As this court held nearly forty years ago in *State* v. *Putnoki*, 200 Conn. 208, 221, 510 A.2d 1329 (1986), "[t]he

State *v.* Foster

determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the [acquittee] must be balanced against the security interests of society. . . . *The . . .* [*court's*] *inquiry should focus on whether the person is a danger to himself or others, whether he presents . . . the risk of imminent physical injury to others or self . . . .* [T]he ultimate determination of mental illness and dangerousness is a legal decision . . . [and, in making that determination] the court may and should consider the entire record available to it, including the [acquittee's] history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released.'' (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *State* v. *Damone*, supra, 148 Conn. App. 170–71.

This legal determination of dangerousness is inherently predictive in nature, with the definition of ''dangerousness'' being ''necessarily vague'' given the difficulty of the prediction, even with the aid of medical expert testimony. *State* v. *Putnoki*, supra, 200 Conn. 219–20. Further, in this context, the word ''[i]mminent'' does not mean immediate or likely but, rather, simply ''ready to take place'' or ''hanging threateningly over one's head . . . .'' (Internal quotation marks omitted.) *State* v. *Harris*, supra, 277 Conn. 389, quoting Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) p. 580.

It is undisputed that the acquittee has a ''psychiatric disabilit[y]'' for purposes of § 17a-593 (c).[13] Accordingly, we turn to the trial court's finding that the acquittee was

[13] Specifically, it is undisputed that the acquittee's bipolar schizoaffective disorder, along with his cannabis use disorder and his borderline intellectual functioning, is a mental illness that is a ''psychiatric disabilit[y]'' for purposes of § 17a-593 (c).

State *v.* Foster

dangerous because he presented the risk of imminent physical injury to himself or others. The acquittee's index offenses of burglary, assault on two school-children, and possession of a weapon on school grounds are indeed violent crimes. Although these crimes took place more than eighteen years before the state filed the operative petition to extend the acquittee's commitment in this case, they nevertheless indicate that the acquittee's psychotic disorder induced delusions—when he was not compliant with his medicinal regimen—could seriously endanger the safety of other people, which supports the trial court's finding of dangerousness. See, e.g., *State* v. *Putnoki*, supra, 200 Conn. 221–22 (index offense is part of "past violent behavior" factor); *State* v. *Maskiell*, 100 Conn. App. 507, 509, 523–24, 918 A.2d 293 (considering acquittee's sexual assault index offenses and pedophilia in connection with risks posed by release), cert. denied, 282 Conn. 922, 925 A.2d 1104 (2007).

We agree with the acquittee that the index offenses are an appropriate consideration in the trial court's dangerousness assessment but are not determinative, particularly given the length of his commitment to the custody of the board. The acquittee has had an approximately two decade commitment that was marked by some difficult years spanning from 2003 to at least 2017. The acquittee had difficulty with his transition from the hospital setting that commenced in 2012, losing permission for temporary overnight leaves in 2013 and 2014 as a result of noncompliance with rules, including assaulting another patient. As aptly noted by the Appellate Court, he also engaged in inappropriate and impulsive behavior toward females, including socially inappropriate comments of a sexual nature, before ultimately transitioning to a residential program in Bridgeport in 2017. See *State* v. *Foster*, supra, 217 Conn. App. 489–90 and n.7.

State *v.* Foster

The acquittee has also had some progress intermittently within those years and even more so after 2017, when the board transitioned him to conditional release status with increasing amounts of privileges and independence. Although consideration of the acquittee's entire history is important, given the length of his commitment, we place particular emphasis on his mental status in the years closest to the petition at issue, which was filed in July, 2019, and which resulted in the board's report dated August 27, 2019. Cf. *State* v. *Putnoki*, supra, 200 Conn. 223 ("[a]n individual's mental and emotional status does not remain static").

Most significant, it was not until 2018, just one year before the state filed the petition for continued commitment that is at issue in this appeal, that the acquittee reached a level of compliance with taking medication and progress sufficient to be granted conditional release. In that approximately one year period during which the acquittee was on conditional release, the acquittee's treaters and evaluators expressed concerns with his discharge from board custody given the short period of time during which he had demonstrated compliance while under supervision on conditional release.

First, Michael Genovese, a licensed clinical social worker, indicated that the acquittee's behavior toward women remained "inappropriate," although his "psychiatric symptoms remained controlled with medication and treatment." Second, Rodriguez, the acquittee's conditional release supervisor, indicated that the acquittee remained functional in the conditional release setting and that he was making progress by doing things such as taking his first unsupervised bus trip. She also noted, however, that "he continued to make inappropriate comments to females" and that he had "expressed the belief that bad things happen in the world because of him"; Rodriguez stated that the acquittee conveyed to her his own concern that "he might be sabotaging his effort to be released from the board's jurisdiction." The

State *v.* Foster

trial court properly credited this testimony by medical providers who treated the acquittee and expressed concerns with discharging him at that time, along with the board's recommendation that the acquittee "continues to require substantial supervision and that he cannot reside safely in the community without the board's continued oversight and support." See, e.g., *State* v. *March*, supra, 265 Conn. 712.

We recognize that the present case, which involves an insanity acquittee who had made progress in his recovery while on conditional release in the community during a lengthy commitment in the custody of the board, presents a circumstance that may well approach the outer limits of when continued commitment to the custody of the board is justified.[14] Especially given the inherently predictive nature of the dangerousness determination; see, e.g., *State* v. *Putnoki*, supra, 200 Conn.

[14] The acquittee also relies on a few Superior Court decisions, *State* v. *Ali*, Docket No. UWY-CR4-108157, 2023 WL 4881439 (Conn. Super. July 3, 2023), and *State* v. *Salzman*, Superior Court, judicial district of Middlesex, Docket No. MMX-CR9-6156 (July 12, 2001), in support of his argument that the trial court's dangerousness finding was nothing more than impermissible "speculation" founded on an "assumption that the index offense(s) render an acquittee perpetually dangerous." He argues that the present case is similar to *State* v. *Dickinson*, Docket No. TTD-CR84-0023695, 2006 WL 2053731 (Conn. Super. July 7, 2006), in which the court concluded that the state had not proven by clear and convincing evidence that the acquittee was dangerous. Id., *7. The court rejected the board's conclusion that the acquittee's inappropriate flirtations with several female staff members supported a finding that he was dangerous, and it credited the testimony of four psychiatrists indicating that he was not dangerous. See id., *6–7.

Beyond the deference that we give the trial court's finding under the clearly erroneous standard of review, the three cited cases are distinguishable from the present case. Although both *Ali* and *Salzman* involved dangerous index offenses, arson and attempted murder, respectively, both cases also had uncontroverted findings of low risk of reoffending, lack of evidence of noncompliance with taking medication or setbacks, and delays in moving the acquittees from a hospital setting to community release status that resulted in case-specific decisions to force discharge. See *State* v. *Ali*, supra, 2023 WL 4881439, *1–2; *State* v. *Salzman*, supra, Superior Court, Docket No. MMX-CR9-6156. Moreover, the insanity acquittee in *Dickinson* no longer required psychotropic medication for his illness. See *State* v. *Dickinson*, supra, 2006 WL 2053731, *6.

219–20; we agree with the Appellate Court that the degree to which the acquittee's progress is a product of the services, structure, and support that he is receiving while on conditional release is a significant factor in the dangerousness analysis, insofar as denying the petition for continued commitment would mean that the acquittee would no longer be required to take advantage of that framework. See *State* v. *Foster*, supra, 217 Conn. App. 493–94. In this respect, an acquittee's willingness to continue treatment and supervision voluntarily is relevant but does not otherwise defeat a finding of dangerousness. See, e.g., *State* v. *Maskiell*, supra, 100 Conn. App. 523–24.

Put differently, the imminence aspect of the dangerousness analysis; see, e.g., *State* v. *Harris*, supra, 277 Conn. 388–89; requires the trial court to consider what may readily happen when an insanity acquittee is no longer required to take medication, to attend counseling, or to have other restrictions in place that may remove potential stressors or triggers. See, e.g., *State* v. *Damone*, supra, 148 Conn. App. 139–40, 162, 171–75 (upholding trial court's recommitment of acquittee, whose index offenses included multiple sexual assaults, even when his major depressive order was in remission with medication and when he was able to hold full-time employment, as acquittee's stability was preserved by board's supervision of treatment and was otherwise at risk given his occasional self-medication with narcotics); *State* v. *Jacob*, 69 Conn. App. 666, 684–85, 798 A.2d 974 (2002) (considering acts of violence that occurred many years prior to hearing and concluding that acquittee's "significant progress toward recovery," including "extended" leaves from hospital and fact that he no longer "require[d] any psychotropic medications," did not undercut trial court's finding of dangerousness when lack of recent dangerous conduct was "due, in part, to the progress he ha[d] made since the time of

State *v.* Foster

his original commitment and, in part, to the fact that he ha[d] been confined, supervised and receiving treatment and, therefore, was less likely to [engage in such conduct]''). That the acquittee in the present case has demonstrated significant clinical progress over only a relatively short period of his lengthy commitment to the custody of the board, and only with the aid of significant support and conditions during his conditional release, supports the trial court's dangerousness finding in this case.

We disagree with the acquittee's argument that considering an insanity acquittee's progress over time, and the extent to which it is the product of the conditions of his commitment, violates *State* v. *Metz*, supra, 230 Conn. 425–26, by shifting the burden of proof from the state to the acquittee. In considering whether the state has proven dangerousness by clear and convincing evidence, the trier of fact must consider, in light of § 17a-593 (g)'s express focus on public safety, the extent to which an insanity acquittee's progress and apparent lack of danger are a product of the conditions under which he is committed to the custody of the board, and what is likely to happen should he lose or no longer be required to take advantage of that support. It is, therefore, more difficult for the state to satisfy its burden of proof when an insanity acquittee has demonstrated success with increasing freedoms and reduced conditions while on conditional release status over a significant period of time.[15] Here, however, the trial

---

[15] We acknowledge the acquittee's argument that ''[a] prejudicial factor typically comes into play here,'' insofar as courts ''may be tempt[ed] to err on the side of caution and to continue a person's commitment because you can never be sure.'' (Internal quotation marks omitted.) *State* v. *Hitt*, 179 Or. App. 563, 573, 41 P.3d 434 (2002). The acquittee argues that this caution ''completely eviscerates [*State* v. *Metz*, supra, 230 Conn. 425–26], by effectively thrusting the burden back [on] the acquittee, thereby improperly realigning the respective interests of the acquittee and the state.'' We are unpersuaded.

*Metz* arose in the case of an acquittee whose continued commitment was under maximum security conditions at Whiting Forensic Institute. See id.,

State *v.* Foster

court could have considered the one year time frame insufficient, especially in light of the testimony from medical providers (in particular, that of the psychiatrists, Trueblood and Westphal) who expressed concern with how the acquittee would fare upon discharge.

The acquittee, however, argues that the board's concerns are "overstated" because, although his "conduct while in the hospital may have been inappropriate relative to hospital or societal norms . . . it does not [satisfy] the heavy burden of establishing risk of imminent physical injury to a woman." The acquittee relies on the testimony, before the board, of his individual psychotherapist, Daniel Papapietro, to the effect that the reported inappropriate touching was "not sexualized," and, instead, "[i]t's touching one on the shoulder, [or] on their back. It's a childlike flirtatiousness." Indeed, Papapietro and Rodriguez testified that they did not believe that the acquittee would pose a risk were he to reenter the community without conditions. Rodriguez also testified as to the acquittee's intention to continue his treatment.

The trial court was not obligated to credit the testimony of Papapietro and Rodriguez to this effect. It is well settled that, although trial courts may "attach special weight to the testimony of medical experts at a hearing to determine mental status," that testimony is not binding because "psychiatric predictions of future dangerousness are tentative at best and are frequently conceded, even within the profession, to be unreliable." *State* v. *Putnoki*, supra, 200 Conn. 219–20. The trial

405, 408. The court in *Metz* did not contemplate the extent to which the trial court, in making its dangerousness determination, must consider less restrictive alternatives, such as the conditional release setting at issue in the present case, and how the often lengthy, and often nonlinear, process of transitioning from hospitalization, to community reintegration, and then to release must unfold. Insofar as the parties to the present case do not seek any modification of *Metz* in this respect, we leave that question to another day and, potentially, to legislative action in the meantime.

State *v.* Foster

court is free to reject a treating clinician's testimony in favor of crediting the board's determination as to dangerousness because "the goals of a treating psychiatrist frequently conflict with the goals of the criminal justice system. . . . [Whereas] the psychiatrist [is] concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence." (Citations omitted.) Id., 220–21. Given the prioritization of public safety under § 17a-593 (g), we conclude that the trial court reasonably weighed the fact that Papapietro had testified that the acquittee had in fact refused to take or had missed doses of medication, which raised the potential of decompensation and a psychosis recurrence, with the fact that the acquittee had not acted violently at those discrete points.

Finally, in upholding the trial court's finding of dangerousness, we emphasize that our opinion is limited to the record in connection with *this* petition, which was filed in July, 2019, more than five years prior to oral argument before this court, and which reflects only approximately one year of conditional release—with Westphal's recommendation to grant conditional release status emphasizing that "substantial conditions" were required to keep the acquittee from posing a danger to himself or others. The acquittee's continued therapeutic progress; see, e.g., *State* v. *Putnoki*, supra, 200 Conn. 222–23; and the extent to which the most recent petition for recommitment has become even further removed from the index offenses, should inform the decision on any subsequent petitions for recommitment under § 17a-593. See footnote 7 of this opinion. Accordingly, we conclude that the Appellate Court correctly determined that the trial court's finding of dangerousness, under the circumstances that existed when it was made, was not clearly erroneous.

353 Conn. 1 AUGUST, 2025 41

State *v.* Foster

The judgment of the Appellate Court is affirmed.

In this opinion McDONALD, D'AURIA, ALEXANDER and DANNEHY, Js., concurred.

ECKER, J., concurring in part and concurring in the judgment. The modern approach to supervising the detention, treatment, and ultimate release of individuals deemed not guilty by reason of mental disease or defect, or insanity (acquittees), outside the confines of the correctional system has dual roots in the progressive reforms of the 1960s and 1970s and the backlash that followed highly publicized crimes such as the attempted assassination of President Reagan in 1981 by John Hinckley, Jr. See, e.g., M. Norko et al., "Assessing Insanity Acquittee Recidivism in Connecticut," 34 Behav. Sci. & L. 423, 423–25 (2016); J. Rogers & J. Bloom, "The Insanity Sentence: Oregon's Psychiatric Security Review Board," 3 Behav. Sci. & L. 69, 70–71 (1985). Connecticut has sought to embrace the best practices in the field, having adopted a version of the highly touted Oregon model in 1985. See M. Norko et al., supra, 424. At its best, this model affords mentally ill offenders humane treatment for their illnesses and ensures appropriate and informed oversight of confinement and discharge decisions, rather than simply imposing indeterminate commitment before releasing them without any assurance that they will successfully reenter society. See M. Norko et al., supra, 424–25; J. Rogers & J. Bloom, supra, 71, 84. At its worst, unfortunately, this approach in practice has subjected individuals suffering from mental illness to unjustifiably prolonged—and, at times, even abusive—deprivations of liberty based on speculative fears unsupported by sufficient evidence that they remain dangerous to themselves or the public. Connecticut has not entirely avoided these pitfalls.[1]

_____

[1] See, e.g., *State* v. *Cusson*, 210 Conn. App. 130, 135, 269 A.3d 828 (describing abuses), cert. denied, 343 Conn. 913, 274 A.3d 114 (2022); see also, e.g., Final Report of the Task Force To Review and Evaluate CVH and WFH, the

State *v.* Foster

Navigating these challenging waters is largely the work of the legislature and the various public and private agencies tasked with supervising the care and treatment of acquittees. See, e.g., *Sastrom* v. *Psychiatric Security Review Board*, 291 Conn. 307, 331 and n.24, 968 A.2d 396 (2009). But the courts also play a vitally important role in the process by safeguarding the liberty interests of acquittees who no longer need commitment. Specifically, the United States Supreme Court has made it "clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection" and "has recognized involuntary commitment to a mental institution, in particular, as involving more than a loss of freedom from confinement . . . due to its stigmatizing consequences, and the potential exposure to invasive, compulsory medical and psychiatric treatment." (Citation omitted; internal quotation marks omitted.) *State* v. *Metz*, 230 Conn. 400, 412–13, 645 A.2d 965 (1994). In applying those principles to Connecticut's own system, this court has explained that, "[d]espite the substantial degree of legislative discretion"; id., 424; "due process . . . imposes significant constitutional constraints on involuntary commitments." Id., 413.

The acquittee in this case, Franklin Foster, argues that (1) the Psychiatric Security Review Board (board) and the trial court relied on impermissible facts, factors, and assumptions in concluding that he "would consti-

Psychiatric Security Review Board, and Behavioral Health Care Definitions (December 16, 2021) p. 24, available at https://www.cga.ct.gov/ph/tfs/20190426_CVH%20Whiting%20Task%20Force/CVH%20Whiting%20Final%20Report.pdf (last visited August 15, 2025) ("[t]here . . . was unanimous concern expressed by the members of the [t]ask [f]orce about the lengthy periods of commitment placed [on] acquittees found [not guilty by reason of insanity]"); D. Tepfer, CT Settles Psychiatric Hospital Abuse Lawsuit for $9 Million, Conn. Post, June 30, 2022, available at https://www.ctpost.com/news/article/CT-settles-psychiatric-hospital-abuse-lawsuit-for-17276464.php (last visited August 15, 2025).

State *v.* Foster

tute a danger to himself or others'' if discharged from the board's custody; General Statutes § 17a-593 (c); (2) the danger requirement imposed by § 17a-593 (c) is unconstitutionally vague, insofar as it is so devoid of standards and guidance as to necessarily result in arbitrary and discriminatory enforcement; and (3) the trial court's finding of continued dangerousness was unsupported by the record and, therefore, clearly erroneous. As I will explain, I largely agree with the acquittee's first contention. Much of the trial court's analysis supporting the acquittee's ongoing commitment was conclusory or, at best, marginally relevant. With respect to the vagueness challenge, I hope to provide some clarification of the judicial gloss that this court applied to the statutory scheme in cases such as *State* v. *Putnoki*, 200 Conn. 208, 510 A.2d 1329 (1986), and *State* v. *Metz*, supra, 230 Conn. 400, to assist the board and trial courts in complying with all statutory and regulatory requirements and steering clear of the constitutional boundaries. With respect to the outcome of the present case, I agree with the majority that it ''may well approach the outer limits of when continued commitment to the custody of the board is justified.'' Text accompanying footnote 14 of the majority opinion. I also agree with the majority that the record is minimally sufficient to support the trial court's findings and conclusions, in light of our deferential standard of review. Especially given that the decision at issue will soon expire even if upheld; see footnote 7 of the majority opinion; my primary focus is on providing sufficient guidance to ensure that future discharge determinations, with respect to both this acquittee and others, fully comply with the law.

I

Before I address the acquittee's case, I offer a few brief observations to better frame my analysis.

State *v.* Foster

## A

First, I do not envy the task of the board and the trial court in these matters. They are charged by statute with predicting a future that defies prognostication. It is unrealistic to expect anyone to determine—by clear and convincing evidence, no less—that an individual like the acquittee, who engaged in a single criminal outburst at the age of twenty-four, when his disease had just emerged and was untreated, is likely to reoffend if he is discharged from the board's custody two dozen years later, after having spent most of his adult life living and receiving treatment in mental health facilities.[2]

Adding to the difficulty inherent in the task of predicting dangerousness is the sometimes vexing question of whether the danger is causally related to one of the acquittee's diagnosed psychiatric disabilities or, rather, is a result of, say, immaturity, or low frustration tolerance, or a self-defeating fear of independence, or low

---

[2] As the acquittee notes, both science and law have long cast serious doubt on clinicians' ability to accurately predict the future, violent behavior of acquittees or other populations, concluding that dangerousness is systemically overpredicted. See, e.g., *State* v. *Putnoki*, supra, 200 Conn. 219–20; C. Slobogin, "Dangerousness and Expertise," 133 U. Pa. L. Rev. 97, 98–127 (1984). In fairness, statistically based models and instruments have a better—and improving—track record, with some measures apparently demonstrating a predictive accuracy approaching 70 percent. See M. Ogonah et al., "Violence Risk Assessment Instruments in Forensic Psychiatric Populations: A Systematic Review and Meta-Analysis," 10 Lancet Psychiatry 780, 784 (2023) (meta-analysis of Historical Clinical Risk Management-20 version 2 demonstrates pooled accuracy of 69 percent predicting violent recidivism); see also S. Ægisdóttir et al., "The Meta-Analysis of Clinical Judgment Project: Fifty-Six Years of Accumulated Research on Clinical Versus Statistical Prediction," 34 Counseling Psychologist 341, 368 (2006) (disparity between clinical and statistical predictions is greatest with respect to predictions of violence and reoffense); J. Stankowski, "Acquittal by Reason of Insanity Is a Positive Outcome for Defendants Who Cannot Be Restored," 48 J. Am. Acad. Psychiatry & L. 244, 246–47 (2020) (surveying literature). Statistics aside, the issue in any given case is not whether the assessments are reliable on average, but whether the prediction can be made with the required degree of confidence based on the facts of that particular case.

353 Conn. 1 AUGUST, 2025 45

State *v.* Foster

intelligence,[3] or any of the myriad other reasons that innumerable sane people commit crimes each day.[4] The requirement that an acquittee be found dangerous *as a result of* his psychiatric disabilities has both statutory and constitutional dimensions. The relevant Connecticut statutes and regulations indicate that discharge may be denied only if the acquittee "has psychiatric disabilities . . . *to the extent that* such acquittee's discharge . . . would constitute a danger to the acquittee or others . . . ." (Emphasis added.) General Statutes § 17a-580 (10); see also General Statutes § 17a-580 (11); General Statutes § 17a-593 (c); Regs., Conn. State Agencies § 17a-581-2 (a) (11). It seems clear to me that the legislature's use of the phrase "to the extent that," rather than "and," requires a causal nexus between the psychiatric disabilities and the resulting danger. See *State* v. *Cuvelier*, 175 Conn. 100, 102 and n.2, 109–110, 394 A.2d 185 (1978) (treating prior version of statute, with substantially similar language, as requiring causal relationship). From a constitutional standpoint, both the United States Supreme Court and this court have stated that an acquittee's dangerousness must be causally related to his mental illness to permit continued confinement.[5]

---

[3] As this opinion will discuss, there is evidence in the record supporting the conclusion that most, if not all, of the "inappropriate" conduct on which the board and the trial court based their respective decisions in the present case resulted from these sorts of character traits rather than from the acquittee's diagnosed psychiatric disabilities. Department of Mental Health and Addiction Services staff testified at the acquittee's hearings regarding the difficulty of parsing out to what extent, if any, the symptoms of the acquittee's schizophrenia contribute to difficulties he may have had adjusting to community living.

[4] For example, Alec Buchanan, a consulting forensic psychiatrist with the Department of Mental Health and Addiction Services, provided some of the most nuanced testimony at the acquittee's hearings regarding the difficulties inherent in trying to predict the acquittee's future dangerousness and likely future medication compliance, given that he committed the index offenses just after his mental illness had emerged and most of the behavioral problems he demonstrated posthospitalization had occurred early on, when his disease was not yet under control. Even Buchanan, however, was unable to address the extent to which the acquittee's behavioral problems are the result of immaturity and attention issues rather than psychiatric disabilities.

[5] "A finding of dangerousness, standing alone, is ordinarily not a sufficient ground [on] which to justify indefinite involuntary commitment. . . . [A]dded

State *v.* Foster

I would imagine that these and other difficulties inherent in the task might act as a strong incentive to prompt the board to follow a maximally conservative path and not to authorize discharge until confidence is high that every last demon has been exorcized and any risk of reoffense eliminated. Courts and commentators have recognized as much,[6] and Department of Mental Health and Addiction Services (DMHAS) staff members acknowledged in this case that "we all take risks when

statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment *rendering them dangerous* beyond their control." (Citations omitted; emphasis added.) *Kansas* v. *Hendricks*, 521 U.S. 346, 358, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997). In *State* v. *March*, 265 Conn. 697, 830 A.2d 212 (2003), this court confirmed that the constitution imposes the same requirement on § 17a-593 (c). See id., 716 ("[A]s long as an acquittee has *a mental illness that requires confinement for purposes of treatment and protection*, his confinement to a psychiatric facility is reasonably related to the purpose of commitment and is, therefore, constitutional. . . . What is important is that the mental illness that the acquittee is currently diagnosed with be of the type of mental illness that might *cause* the acquittee to be dangerous if discharged." (Citations omitted; emphasis added; internal quotation marks omitted.)); see also *People* v. *Wilder*, 33 Cal. App. 4th 90, 101, 39 Cal. Rptr. 2d 247 (1995) ("requiring the prosecution to prove dangerousness because of mental disease, defect, or disorder . . . [en]sures that the extended commitment bears a reasonable relation to the purpose of commitment"), review denied, California Supreme Court, Docket No. S046088 (June 14, 1995); *Rinne* v. *Psychiatric Security Review Board*, 297 Or. App. 549, 558, 443 P.3d 731 (2019) (proceeding on assumption that there must be "a causal connection" or "a nexus" between qualifying mental disease or defect and dangerousness).

[6] See, e.g., *State* v. *Hitt*, 179 Or. App. 563, 573, 41 P.3d 434 (2002) ("[I]t may be tempting to err on the side of caution and to continue a person's commitment because you can never be sure. . . . [T]hat reasoning would, effectively, transform [an acquittee's] commitment into a permanent commitment because no judge can ever be sure that the committed person will not engage in further violence. That reasoning, however, effectively shifts the burden of proof from the state to [the acquittee]." (Emphasis omitted; internal quotation marks omitted.)); J. Stankowski, "Acquittal by Reason of Insanity Is a Positive Outcome for Defendants Who Cannot Be Restored," 48 J. Am. Acad. Psychiatry & L. 244, 248 (2020) ("[Some] clinicians, aware of [their] responsibility not only to the patient, but the court and [the] community, may become so [risk averse that] they see little benefit to any release. In sum, although the link between insanity, mental disorder, and dangerousness has been shown to be weak, there are myriad strong pressures that conspire to keep insanity acquittees locked up indeterminately." (Footnote omitted.)); Note, "The Guilty but Mentally Ill Verdict and Due Process," 92 Yale L.J. 475, 482 (1983) ("officials may wish to avoid releasing a person declared mentally ill and guilty, since the public may hold their institution responsible if the released person is subsequently accused criminally").

State *v.* Foster

we recommend someone for a transition to the community'' and that "the hospital certainly wants to be conservative . . . ." After all, if an acquittee is discharged after the maximum term of commitment,[7] the best outcome will be one that attracts no attention; with the assistance of available services, the acquittee will gradually learn to readapt to life in the community and to manage his illness, without incident, on a more independent basis. The worst outcome, of course, is that he will decompensate and that tragic results will follow, with public opprobrium falling squarely on the board, the trial court, and anyone else whose judgment can be questioned in hindsight.

But, while the decision to discharge an acquittee, in the face of such uncertainty, may be a difficult one, that's the job description. It would, no doubt, be comforting to many people if previously violent acquittees remain indefinitely committed until the treatment team, the board, and the trial court all can guarantee their future harmlessness. But we cannot allow the understandable desire for certainty to distort the legal standards established by statutory and constitutional command.[8] The specific task for this court in the present

[7] General Statutes § 17a-582 (h) creates a presumption that an acquittee will be discharged from the jurisdiction of the board upon the expiration of his "maximum term of commitment," as established by the trial court, which cannot exceed the maximum sentence that could have been imposed if he had been convicted of the index offenses. See also General Statutes § 17a-582 (e) (1) (A).

[8] In this case, one member of the board indicated that, although the board is sensitive to the various roadblocks that the system creates for acquittees seeking to reintegrate into society, he believed that his hands were tied because "the board's mission is . . . mitigating risk." That's not quite right. The members of the board are not underwriters, quality control inspectors, or others whose mission it is to eliminate risk as much as possible given financial and other constraints. Rather, they are legally compelled to discharge an acquittee after the maximum term of commitment unless the state proves by clear and convincing evidence that he poses a danger. A security screener, whose job it is to allow anyone to enter unless they plainly pose a well-defined security risk, would be a more apt metaphor.

These principles are fully consistent with subsection (g) of § 17a-593, which provides in relevant part that the trial court, in making its final determination as to whether to discharge the acquittee, must "[consider] that its primary concern

State *v.* Foster

case is to articulate and enforce clear, consistent, and administrable standards under § 17a-593.

B

My second observation is that not only is dangerousness notoriously difficult to predict, but the concept of dangerousness itself is very difficult to pin down. See, e.g., *State* v. *Putnoki*, supra, 200 Conn. 219; *State* v. *Gates*, 198 Conn. 397, 403, 503 A.2d 163 (1986); *State* v. *Krol*, 68 N.J. 236, 258, 344 A.2d 289 (1975). What is clear is that both the relevant statutes and regulations, and the due process clauses of the federal and state constitutions, place substantive limits on the ability of the state to perpetually confine a mentally ill individual on the basis of some perceived dangerousness. What has not always been clear is whether this and other courts, in describing the standards and guidelines that govern a dangerousness determination, were purporting to construe the particular statute at issue or to place on that statute a judicial gloss so as to conform it to constitutional requirements. See, e.g., *Foucha* v. *Louisiana*, 504 U.S. 71, 77–78, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). Nor can expert psychiatric testimony and the constantly evolving scientific research that informs (or should inform) that testimony be disregarded, despite our cryptic statement that the ultimate determination

is the protection of society and [that] its secondary concern is the safety and well-being of the acquittee . . . .'' I read this statement merely to underscore the statutory command that a trial court not discharge an acquittee who continues to pose an imminent danger to society, even if discharge might be in his individual best interest. The statutory guidance comes into play only at the end, after the court has made the relevant findings and determinations regarding the acquittee's mental condition; see General Statutes § 17a-593 (g); and this court has made clear that the statute cannot be construed in such a way as to place a thumb on the scale in favor of indefinite, involuntary commitment or to otherwise offend due process. See *State* v. *Metz*, supra, 230 Conn. 419–26. If the ''primary concern'' language were construed more broadly, it would not only run afoul of *Metz* but would, in effect, nullify General Statutes § 17a-582 (h), which provides in relevant part that, by default, ''the acquittee shall be immediately discharged at the expiration of the maximum term of commitment.''

State *v.* Foster

is a legal or societal decision, rather than a medical one. See, e.g., *State* v. *Putnoki*, supra, 200 Conn. 219, 221.

Because the ultimate determination that the trial court must make is a legal one, it will be helpful to briefly restate the legal principles, factors, and standards that are relevant to a determination of dangerousness in this context. First, to avoid constitutional peril, the state must carry its burden of demonstrating "that the acquittee is currently mentally ill and dangerous to himself . . . or others" by clear and convincing evidence. *State* v. *Metz*, supra, 230 Conn. 425. This burden is a "heavy" one. (Internal quotation marks omitted.) *State* v. *Lenarz*, 301 Conn. 417, 438, 22 A.3d 536 (2011), cert. denied, 565 U.S. 1156, 132 S. Ct. 1095, 181 L. Ed. 2d 977 (2012); see also *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 795, 700 A.2d 1108 (1997) ("the clear and convincing evidence standard should operate as a weighty caution [on] the minds of all judges, and it [is not satisfied] whenever the evidence is loose, equivocal or contradictory" (internal quotation marks omitted)). The trial court cannot, in effect, reverse the burden of proof by requiring the acquittee to demonstrate to the court's satisfaction that there is little or no risk that he ever will reoffend. See *State* v. *Metz*, supra, 421–22 (concluding, in light of policy and constitutional considerations, that "the legislature would not have intended to impose, even on an insanity acquittee, a never-ending burden of rebutting an indefinite presumption of continuing insanity and dangerousness").

Second, although the acquittee's index offenses, as well as any other past violent behavior, are relevant factors; see *State* v. *Putnoki*, supra, 200 Conn. 221; the primary consideration must be the acquittee's "*present* mental condition." (Emphasis in original.) Id., 223; see *State* v. *Metz*, supra, 230 Conn. 426 ("the presumption of the existence of facts warranting the [acquittee's] commitment does not survive the expiration of the max-

State *v.* Foster

imum term of criminal sanctions"); see also *Powell* v. *Florida*, 579 F.2d 324, 333 n.10 (5th Cir. 1978) ("[although] an initial commitment of an acquittee may well focus [on] the crime committed, the release of an [acquittee] more properly looks to that individual's behavior since the crime to determine whether . . . his recent behavior demonstrates his continuing dangerousness"). Factors relevant to the acquittee's present mental condition include, among other things, "his present and past diagnoses . . . the need for continued medication and therapy, and the prospects for supervision if released."[9] *State* v. *Putnoki*, supra, 221. Likewise, the significance of the acquittee's index offenses, and other incidents of violence, is greater the more recently and regularly such conduct occurred. See, e.g., *State* v. *Long*, 301 Conn. 216, 228–29, 19 A.3d 1242 (acquittee committed approximately fifteen assaults between 1998 and 2007, the latter being one year before his continued commitment hearing), cert. denied, 565 U.S. 1084, 132 S. Ct. 827, 181 L. Ed. 2d 535 (2011); *State* v. *Putnoki*, supra, 222 (acquittee's index offense was recent and extremely violent murder of her disabled mother-in-law); *State* v. *Gates*, supra, 198 Conn. 403 ("[t]he accuracy of such predictions is much greater where there is a pattern of repetitive assault and violent conduct"). In addition, although, "[i]n reaching its difficult decision, the [trial] court may and should consider the entire record available to it"; *State* v. *Putnoki*, supra, 221; evidence of oppositional, noncompliant, or inappropriate behavior is relevant only insofar as it speaks to the acquittee's psychiatric disabilities and any resulting danger.

Third, the state must prove, by clear and convincing evidence, that the acquittee, if discharged, would be

[9] The trial court's memorandum of decision did not address the acquittee's prospects for supervision if released—an important factor in cases of this sort—other than to say that the court was skeptical of the acquittee's stated intent to voluntarily comply with mandated safeguards. There was undisputed testimony that all of the treatment services available to him would continue to be available upon discharge.

State *v.* Foster

*imminently* dangerous. Although the term "danger" as used in § 17a-593 (c) is not defined in the statute,[10] the governing regulation provides: " 'Danger to self or to others' means the risk of *imminent* physical injury to others or self, and also includes the risk of loss or destruction of the property of others." (Emphasis added.) Regs., Conn. State Agencies § 17a-581-2 (a) (6). In *State* v. *Harris*, 277 Conn. 378, 890 A.2d 559 (2006), in the context of resolving an evidentiary challenge, this court addressed whether the standard of dangerousness applied to acquittees is less stringent than that which applies in the civil commitment context. See id., 388–89. The court in *Harris* concluded that, because the acquittee must be imminently dangerous to remain committed under § 17a-581-2 (a) (6) of the regulations, the standard is at least as stringent as the civil commitment standard; see id., 389; see also *State* v. *Dyous*, 307 Conn. 299, 333 n.19, 53 A.3d 153 (2012); which requires "a *substantial* risk that physical harm will be inflicted by an individual upon his or her own person or upon another person . . . ." (Emphasis added.) General Statutes § 17a-495 (b). In support of the conclusion that the dangerousness standard applied by § 17a-593 (c) is a "demanding" one; *State* v. *Harris*, supra, 389; this court pointed to one dictionary that defined " '[i]mminent' " as " 'ready to take place; [especially] hanging threateningly over one's head . . . .' "[11] Id., quoting Merriam-Webster's Collegiate Dictionary (10th Ed.1993) p. 580.

Notably, although this court briefly discussed § 17a-581-2 (a) (6) of the regulations in *Harris*, we have never

---

[10] General Statutes § 17a-580 (5) does specify that " '[d]anger to himself or others' includes danger to the property of others . . . ."

[11] Singling out the "hanging threateningly over one's head" language that *Harris* chose to highlight; (internal quotation marks omitted) *State* v. *Harris*, supra, 277 Conn. 389; is problematic because, like the sword of Damocles, a threat can hang over one's head for one's entire life without ever drawing blood. The metaphor captures the proximal connotations of the word "imminent," less so the temporal ones.

State *v.* Foster

engaged in a proper statutory construction of that regulation, which presumably would entail both a more thorough review of "the commonly approved usage of the language"; General Statutes § 1-1 (a); as well as a consideration of how the legislature has used the phrase "risk of imminent physical injury" in related statutes. See General Statutes § 1-2z; see also *Alexandre* v. *Commissioner of Revenue Services*, 300 Conn. 566, 578, 22 A.3d 518 (2011) ("[a]dministrative regulations have the 'full force and effect' of statutory law and are interpreted using the same process as statutory construction, namely, under the well established principles of . . . § 1-2z"). A full analysis of the regulatory language is beyond the scope of this concurrence. However, one brief point regarding the imminence requirement warrants mention.

The meaning of the word "imminent" in the English language always refers to proximity, almost always temporal proximity. See, e.g., The American Heritage Dictionary of the English Language (3d Ed. 1992) p. 903 (defining "imminent" to mean "[a]bout to occur; impending"); The Random House Dictionary of the English Language (2d Ed. Unabridged 1987) p. 957 (defining "imminent" as "likely to occur at any moment; impending"). In *Harris*, this court emphasized that the "imminent" language requires not only that the danger posed by the acquittee be substantial, but also that it be " 'ready to take place . . . .' " *State* v. *Harris*, supra, 277 Conn. 389. This is what the word "imminent" means in common usage, and it is what it means in every other legal context that I have seen in which the legislature has used the term "imminent physical injury." See, e.g., General Statutes § 52-146q (c) (2) (social worker may disclose confidential records and communications of person consulting social worker only when "[the] social worker determines that there is a substantial risk of imminent physical injury by the person to himself or

State *v.* Foster

others");[12] see also, e.g., *Haynes* v. *Middletown*, 314 Conn. 303, 322–23, 101 A.3d 249 (2014) (for purposes of identifiable person, imminent harm exception to governmental immunity, "the proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm"); *State* v. *Parnoff*, 160 Conn. App. 270, 279, 125 A.3d 573 (2015) (for purposes of fighting words exception to first amendment, court cited " 'hanging threateningly over one's head' " definition of " '[i]mminent' " and concluded that imminence component was missing because defendant was not "immediately capable of the violent act"), aff'd, 329 Conn. 386, 186 A.3d 640 (2018). As I will explain, the board's decision in the present case, as well as the decision of the trial court that upheld the board's decision, largely ignored the existence and significance of the word "imminent" in § 17a-581-2 (a) (6) of the regulations.

II

The trial court explained its conclusion that the acquittee would constitute a danger to himself or others if discharged both in its brief memorandum of decision and during the hearings it conducted on the state's petition for continued commitment and the acquittee's subsequent motion for rectification. I have serious problems with four aspects of the court's analysis.

[12] No one would seriously maintain that, when the legislature authorized a clinical social worker to violate a patient's therapeutic confidentiality to prevent *imminent* physical injury to a third party, it meant that the social worker could do so any time he concluded that some patient *might* experience stressors in her life, those stressors *might* cause her to stop taking prescribed medications, pausing medications *might* lead to a relapse, a relapse *might* cause her to wish to harm others, and she *might* eventually act on those wishes. See *State* v. *Orr*, 291 Conn. 642, 652, 969 A.2d 750 (2009) (scope of "[the] exception [under § 52-146q (c) (2)] is precise and limited" by language of statute).

A

First, the trial court indicated that its primary concern was the protection of schoolchildren. It goes without saying that this is a perfectly valid concern. If clear and convincing evidence supported a finding that the acquittee continued to pose an imminent danger to schoolchildren, then discharge would not be appropriate. But, here, there is no such evidence, certainly not enough to make the required showing. The only evidence the court identified in support of its conclusion that the acquittee poses an ongoing danger to schoolchildren was the index offenses themselves, which took place on a single occasion eighteen years before the date of the petition for an order of continued commitment. The offenses occurred in 2001, when the acquittee was twenty-four years old and his schizophrenia was just beginning to manifest itself. At that time, while experiencing hallucinated auditory commands, he entered a school with the intention of picking a fight with the first person he encountered. He physically lifted a sixth grade girl but put her down unharmed. He then assaulted a sixth grade boy, slapping, punching, and kicking the youth.[13] At the time, the acquittee had two small knives in his backpack, but there is no indication that he used them or took them out during the incident. There also is no indication that, in the intervening eighteen years between the date of the index offenses and the court's hearing on the state's petition, the acquittee ever considered assaulting or harming another child, let alone did so, even though he had spent extensive time in various community placements during that period.

Although it is not improper for the trial court to consider the acquittee's index offenses as one factor,

_____

[13] There is no indication in the record as to whether either child suffered any permanent physical or psychological injuries.

State *v.* Foster

among many, when assessing dangerousness, the only purpose of that inquiry is to assess whether the acquittee is *presently* dangerous. See, e.g., *State* v. *Putnoki*, supra, 200 Conn. 221, 223. When a sufficient amount of time has passed and the maximum term of commitment has terminated, as in the present case, the commission of the index offenses, standing alone, can no longer support a presumption of ongoing dangerousness. See, e.g., *State* v. *Krol*, supra, 68 N.J. 247. Giving any significant weight to the index offenses in this case is particularly inappropriate because the acquittee had no criminal history prior or subsequent to the index offenses, and those offenses were misdemeanors or relatively low-level felonies.[14] Two decades later, something more than the index offenses is needed to establish present dangerousness. Cf. *Fasulo* v. *Arafeh*, 173 Conn. 473, 477, 378 A.2d 553 (1977) ("the longer the commitment, the greater the safeguards [that] are required to ensure that no one is deprived of liberty without due process").

The trial court did not leave us to guess why it focused on the safety of schoolchildren despite there having been no evidence that the acquittee himself posed any risk to schoolchildren in 2019 or thereafter. The court discussed at some length the spate of school shootings that have plagued this country since the Columbine High School massacre in 1999: "[T]he protection of our children . . . [is] in the press every single day. Somebody goes into a school with a firearm, and you know what happens.

---

[14] The acquittee was charged with assault in the third degree, a class A misdemeanor; see General Statutes § 53a-61 (b); as well as burglary in the first degree, a class B felony; see General Statutes § 53a-101 (c); risk of injury to a child, a class C felony; see General Statutes § 53-21 (a) (1); and possession of a weapon on school grounds, a class D felony. See General Statutes § 53a-217b (c).

To be clear, any act of violence of any sort involving schoolchildren is a very serious matter. My point relates to the statutory assessment of future dangerousness almost two decades later on the basis of child related index offenses that the legislature has chosen to categorize as misdemeanors or class C felonies, particularly in circumstances in which there is no evidence that the acquittee either intended to or did cause serious injuries to the victims.

State *v.* Foster

* * *

"There's an underlying criminal behavior here where children were exposed to what society has become acutely aware of . . . . We all sit there. In our own state, we saw it [at Sandy Hook Elementary School in Newtown] . . . where somebody didn't mitigate risk, where we . . . fell down. We fell short of what . . . our society requires of us . . . as centurions of the public good. . . . [W]e had dead children on our hands here because somebody didn't mitigate risk."

These observations are true. They are also irrelevant. We all are painfully aware of the "appalling series of crimes" committed at Sandy Hook Elementary School, as well as other mass school shootings. *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 65, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co.*, *LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019). As a legal matter, however, the fears expressed by the trial court have nothing to do with the assessment of dangerousness that the court was required to make in this case. There was no evidence from any source, much less clear and convincing proof, suggesting that the acquittee would engage in such behavior in the future, imminently or at any later time. The trial court disregarded the relevant evidence and, on the basis of groundless fears drawn from the evening news, deemed *this* acquittee dangerous because his index crimes are vaguely and tangentially evocative of far more serious crimes, committed by different perpetrators, against different victims, by different means, and for fundamentally different reasons.

B

The trial court indicated that its second principal concern was the acquittee's "inappropriate behavior toward women," an observation that unfortunately also took on the form of social commentary. The court elabo-

353 Conn. 1 AUGUST, 2025 57

State *v.* Foster

rated: "[T]he other [area the court is concerned with] is the license that [the acquittee has] tak[en] with our women in society today. We have become focused, very clearly, on what do we do to protect women's rights and controlling, if you will, impulse control of others with regard . . . to the security of their person. . . . Somebody gets on a bus and sits next to a female and strikes up a conversation. Irrespective of what the motivation is, he puts his hand on the woman's leg. You know what that can turn into today in our society . . . . The license that was given . . . thirty or forty years ago simply doesn't pertain today. It isn't applicable to today's societal norms, and it shouldn't be.

\* \* \*

"The two areas in our society today . . . we have become focused on [are] protecting our kids, especially in school settings, and protecting our better halves.

\* \* \*

"And we've become acutely aware of the protection of our females in society today. And their rights . . . their God given rights to be secure in their persons, if you will, and maybe secure in . . . their psychological and psychiatric makeup. Because you can do a lot of damage both ways to women, and we've become acutely aware of that in our society today." The court went so far as to say that, "[i]rrespective of what the cause is, I am concerned [that] our women in society be protected from any kind of irrational . . . or inappropriate behavior."

The trial court's analysis of the acquittee's purported danger to women is at least as troubling as its analysis of the danger to schoolchildren. Once again, it is clear that the court's intentions were good. I would phrase the issue differently, but there is no question that sexual harassment and sexual violence are serious problems

State *v.* Foster

and that women have a right to be free from those incursions, in the workplace, on a hypothetical bus, in society at large. But, as with the school shootings, the trial court's concern with addressing societal problems, and with misconduct perpetrated by others, led the court far afield from the legal question that it was charged with resolving, namely, whether there is clear and convincing evidence that this particular acquittee poses an imminent danger to others (including women, of course) by virtue of his psychiatric disabilities.

No doubt the record discloses some reason to be concerned about the acquittee's attitude toward and treatment of women. Although he has never been charged with or accused of any crime of sexual violence, one of the victims of his index offenses was a girl. Perhaps more to the point, the acquittee has a history of what might be seen as sexualized or inappropriate speech and conduct toward female hospital staff members. That said, however, the applicable legal standard for continued commitment requires significantly more specific and severe conduct than "irrational . . . or inappropriate behavior" toward women, irrespective of the cause or motivation, which is all that the trial court apparently required. Under the statute, the court was required to find that whatever danger the acquittee posed to women was both imminent and *a result of* his psychiatric disabilities. See generally footnote 5 of this opinion and accompanying text. At a constitutional level, the United States Supreme Court has made clear that a "[l]oss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by [abnormal or] idiosyncratic behavior." *Addington* v. *Texas*, 441 U.S. 418, 427, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979).

Upon examination, it appears clear to me that the evidence is not there. Indeed, the expert testimony of the state's own psychiatrists and other hospital staff

State *v.* Foster

largely undercuts any suggestion that the acquittee posed any actual and appreciable danger to women on the basis of his "inappropriate conduct." Although the board's reports over the years repeatedly have referenced and relied on the acquittee's "inappropriate boundaries" with and behavior toward women, those generic descriptors could encompass a wide range of conduct. The sparse supporting evidence for the board's conclusion reveals that, although the acquittee's behavior toward women has been unsuitable, especially for a professional setting, his conduct falls on the mild end of the range of inappropriate conduct in context.[15] One of the few pieces of supporting evidence I could locate was a 2012 statement from Alec Buchanan,[16] a DMHAS consulting forensic psychiatrist, who testified that the acquittee addressed some female staff as "baby" and requested hugs from them. Justin Winkel, the unit psychologist, concurred: "[S]ometimes, [the acquittee] will push things too far in his attention seeking way. He'll start to joke around and sometimes become . . . mildly inappropriate . . . asking for hugs, making comments, [and] expressing his affection for some staff . . . . And, most of the time, it's very innocuous, it's not a problem whatsoever. But, you know, some of the staff, it will rub the wrong way."

Subsequent testimony by other DMHAS staff confirmed that the acquittee's "mildly inappropriate" behavior toward women was neither dangerous to them (although some were understandably offended) nor an outgrowth of his psychiatric disabilities. They testified

_____

[15] To be crystal clear, I do not condone or excuse any of the conduct at issue, which is clearly unwelcome and entirely inappropriate. My point is that the conduct does not demonstrate the statutory standard of dangerousness selected by the legislature to determine whether to discharge the acquittee from commitment.

[16] Buchanan's testimony offers an excellent example of helpful mental health evidence. He focuses on the legally relevant questions and provides sufficiently detailed and nuanced support for his conclusions to be useful to the trial court.

State *v.* Foster

that the acquittee is emotionally immature and has spent almost his entire adult life living in mental health facilities, where there were few, if any, opportunities to pursue healthy adult relationships and where any romantic relationships would require the permission of his treatment providers. Claudia Krasnicki, a hospital psychologist, explained that, under those circumstances, the acquittee "tended to treat staff like extended family, given that he entered the hospital at a very young age. The line staff became overwhelmed by his constant neediness and sometimes interpreted [the acquittee's] desire for affection as sexual in nature."[17] Daniel Papapietro, the acquittee's individual psychotherapist since approximately 2007, agreed that his conduct toward women is neither predatory nor symptomatic: "[W]hat gets labeled as inappropriate touching is . . . not sexualized, in terms of touching . . . inappropriate parts of a woman's body. It's touching one on the shoulder, on [the] back. It's a childlike flirtatiousness. It has not [at] all, in my view, had the tenor of some kind of predatory, sexual, or sexualized behavior. . . . I don't think he's done that out in the community. As far as I'm aware . . . he's managed his boundaries out there . . . appropriately." The acquittee "means well and has never been spontaneously aggressive or predatory in any way. . . . His inappropriate juvenile flirtation with female staff through inappropriate comments [is] as much about him being lonely and in search of some emotional and physical intimacy as it is about him doing it to . . . play with them, [to] get a rise out of them . . . ." (Internal quotation marks omitted.)

_____

[17] In 2015, the board reported that, "for administrative reasons" that had nothing to do with the acquittee, he had been abruptly transferred to a different unit, leaving him little time to "terminate with . . . his treatment team" of eight years. This sudden loss of what was, in effect, his family contributed to his "long-standing pessimism" that he would ever be permitted to leave. He began to miss sessions of his trauma group, which resulted in his temporary leaves being placed on hold.

State *v.* Foster

At the discharge hearings in 2019, the only recent example of the "inappropriate comments" on which the board and the trial court relied was provided by the acquittee's conditional release supervisor, licensed clinical social worker Madeline Rodriguez. She testified that the acquittee "may say, 'you look nice today,' or 'you're beautiful.' Never any threatening remarks . . . ." Rodriguez further testified that she had no concerns about the acquittee's "boundary issues" with respect to how he would interact with the general public.

As the finder of fact, the trial court was perhaps free to reject all of the experts' testimony and to conclude that (1) the acquittee continues to act "inappropriately" toward women *as a result of his psychiatric disabilities,*[18] and (2) his inappropriate conduct is not merely bizarre, distasteful, or offensive, but renders him imminently *dangerous* (or exemplifies his dangerousness). But the board is required by statute to substantiate its findings and conclusions; see General Statutes § 17a-593 (d); and, certainly, the best practice, if not the constitutional mandate, is for the trial court to do so as well. See, e.g., *State* v. *Dyous*, 198 Conn. App. 253, 268–69 n.11, 233 A.3d 1138 (best practice is for state

---

[18] The trial court found that "the state has established by clear and convincing evidence that (1) [the acquittee] suffers from a psychiatric illness diagnosed as: schizoaffective disorder bipolar type; (2) borderline intellectual functioning; (3) inappropriate and impulsive behaviors especially toward females; [and] (4) frustration difficulties." The first finding clearly satisfies the statutory requirement that the acquittee must suffer from "psychiatric disabilities . . . ." General Statutes § 17a-593 (c). To the extent that the court also was suggesting that frustration difficulties and inappropriate, impulsive behaviors toward women qualify as diagnosable psychiatric disabilities for purposes of the statute, such a finding is without support in the record and would be clearly erroneous. In addition, the acquittee's intelligence quotient, originally assessed at 74 and later revised to 83 (both within the second standard deviation below the mean), is not low enough to qualify him as "a person with intellectual disability" for purposes of § 17a-593 (c). See General Statutes § 17a-580 (8) (" '[i]ntellectual disability' has the same meaning as provided in [General Statutes §] 1-1g"); see also General Statutes § 1-1g (a) and (b) (defining "intellectual disability" as "a significant limitation in intellectual functioning," meaning "an intelligence quotient more than two standard deviations below the mean").

State *v.* Foster

to present evidence that acquittee's mental illness diagnosis is based on current Diagnostic and Statistical Manual of Mental Disorders), cert. denied, 335 Conn. 948, 238 A.3d 17 (2020); *State* v. *Corr*, 87 Conn. App. 717, 732, 734, 867 A.2d 124 (trial court addressed each *Putnoski* factor before denying petition), cert. denied, 273 Conn. 929, 873 A.2d 998 (2005). In the present case, if the court was persuaded that the evidence supported these conclusions, it should have made those specific findings and pointed to supporting evidence in the record.[19] Conclusory statements regarding inappropriate conduct toward women and changing societal mores are not enough.

At times, the trial court stepped even closer to error by suggesting that the danger that the acquittee purportedly posed to these two vulnerable groups, schoolchildren and women, meant that he personally did not deserve the benefit of heightened constitutional protection: "Those are the two things that I'm primarily concerned with here. And . . . that's why . . . intermediate scrutiny is not the applicable standard. *Not when it comes to him.* . . . When it comes to him, I think the history of the case and the underlying charges indicate quite the opposite." (Emphasis added.) The court concluded: "I don't believe, in this particular case,

_____

[19] As the majority describes, there were a few minor incidents in 2016 and 2017 that, although not clearly dangerous, reasonably could have been perceived as threatening by female staff. In one, the acquittee stood so as to seemingly bar a female staff member's exit from a utility closet. He later said that he should slap another woman. With respect to the first, he further was alleged to have said, " '[Rosina] Bandanza told me to watch out for you, that you were out to get me. Well, then, I'm out to get you.' " There is no way to tell if these events served as the basis for the trial court's legal conclusions. I will not venture an opinion as to whether these events, which occurred several years prior to the hearing on the state's petition and did not involve acts of physical violence, provided clear and convincing evidence of imminent, future dangerousness in 2019. I would observe, however, that there was no evidence connecting these events to the acquittees' psychiatric disabilities. Notably, during that same time period, the acquittee was the victim of several unprovoked physical assaults by a psychotic roommate, to which he never retaliated.

353 Conn. 1 AUGUST, 2025 63

State *v.* Foster

as it relates to this particular [acquittee], that intermediate scrutiny is the appropriate standard of review.''

The standard that governs a legal challenge sounding in due process or equal protection is dictated by the nature of the constitutional interests involved and whether the individual is a member of a protected class. See part I of the majority opinion. The nature of the individual's crimes (actual or potential) and the identity of his victims are wholly irrelevant to the question of which level of scrutiny applies.

C

The third aspect of the trial court's analysis that most concerns me is that it could be read to improperly place on the acquittee the burden of satisfying the court that he poses no danger to society. The following additional facts are relevant.

The board's July 30, 2018 report to the trial court cited testimony from Alexander Westphal, DMHAS consulting forensic psychiatrist, that the acquittee was fully engaged in treatment, compliant with his medication, and clinically stable. Specifically, Westphal testified that the acquittee "had been free from psychotic symptoms for several years.'' Crediting this testimony, the board found that the acquittee had "remained clinically stable and cooperative with treatment'' since January, 2016.[20] Given that he also had demonstrated "good progress'' with respect to nonpsychiatric traits such as poor social skills and low frustration tolerance, the board approved his conditional release into the community. By the time the board filed its next report with the court on September 3, 2019, the acquittee had been successfully living in the community for approximately fifteen months and had been enjoying community leave

_____

[20] Aside from early 2016, when there were some minor issues with medication noncompliance, there had been no issues with violence, psychotic symptoms, or medication noncompliance since 2014.

privileges for more than seven years without any incidence of violence. At that time, the board reported that his psychiatric symptoms remained controlled with medication and treatment, and that he continued to make progress.

Accordingly, when the trial court issued its decision in December, 2019, the undisputed evidence was that the acquittee had been clinically stable and symptom free, had taken his medications and complied with his treatment regimen, and had made steady progress for nearly four years, culminating in a fifteen month period of living in the community without incident. Indeed, there was undisputed testimony that the acquittee had been a leader in his community placement, helping to facilitate groups and assisting other community members who were struggling. The court appeared to accept the board's findings, repeatedly noting that the acquittee had made progress and that his release into the community was stable. The court nevertheless seemed to put very little stock in those years of progress, telling defense counsel that "what I'm concerned about here is [that] you seem to dismiss the underlying criminal behavior and the [acquittee's] history . . . simply because of the progress he has made over the last, two, three, five years," and that "you're asking me to take the . . . leap here, the great leap of faith."

As I will discuss, there was enough (perhaps just barely enough) evidence in the record to support the trial court's ultimate determination that the acquittee continued to pose a danger as a result of his psychiatric disabilities (combined with his substance abuse issues). But, at some point—and two decades is well past that point—a nearly four year track record of steady, symptomless progress becomes far more relevant evidence with respect to present dangerousness than the isolated, decades old incident that led to his involuntary commitment. And, while we may assume that the trial

court applied the proper burden of proof and was speaking only metaphorically, we ought not suggest, in any manner, that allowing acquittees back into the community after their maximum term of commitment requires an impermissible "leap of faith" and that we will not take that leap until we have achieved, as faith has been aptly described, "the assurance of things hoped for, the conviction of things not seen." Hebrews 11:1 (English Standard Version). By the very nature of the statutory directive, the trial court is required to prognosticate the future, regardless of its disposition. There are no assurances, and it is improper to deny a petition unless the acquittee or his lawyer provides the court with a warranty of performance. The statutory scheme, in fact, imposes the burden on the state to do the opposite.

D

Fourth, I am struck by the extensive record evidence indicating that many of the behavioral traits and much of the oppositional conduct that seem to create barriers to the acquittee's release may have an iatrogenic source, that is, result from the conditions of confinement as much (or more) than mental illness. One way to uncover this phenomenon is by examining what the acquittee's treating doctors say about his behavioral issues. Doing so must lead an observer to reflect on the fact that labels such as "[i]nappropriate and impulsive behaviors" and "[f]rustration difficulties," which the trial court used to justify the acquittee's ongoing commitment, may mask a tragic situation, if not a downright failure of the system. The acquittee's treating doctors consistently have expressed the view that the system administered by the board sets acquittees up for failure, places them at the mercy of undertrained staff who may impede their progress, and ultimately traps them in a vicious cycle by which they are conditioned to behave immaturely and irresponsibly and then punished for exhibiting those traits by being deprived of the opportunity to grow. Here

State *v.* Foster

is just a sampling of the feedback that the acquittee's treatment providers repeatedly have provided to the board over the past dozen years, since the completion of his maximum term of commitment:

- "Some of what seems to be going on with [the acquittee] is more characterological . . . attention seeking . . . trying to respond to boredom. Those kinds of things get in the way of [his] being able to . . . move forward in some of his treatment . . . . And we continually . . . try and get the staff to be somewhat accepting of his limitations . . . ." (Justin Winkel, December 7, 2012).

- "[The acquittee] has struggled over the months with frustration and lack of any clearly defined goals that could put him back on track. . . . [H]e would express his hopelessness . . . .

  * * *

  "Over the years, when he felt staff was . . . 'rude, just telling people what to do, because they can' . . . he would act out immaturely, by arguing, calling names, and, if it escalated, he would refuse one or two doses of his medications. . . . [He] has always returned to full compliance with medications in a short period of time."[21] (Kevin Trueblood, January 8, 2016).

- "During the past few years, [the acquittee's therapy sessions have] not had anything to do with the crime or his mental illness. The sessions have, instead, focused on his self-defeating behaviors, his immaturity, his adolescent rebellion when he feels like staff are treating him like a child, and how all of that has contrib-

---

[21] At the January 8, 2016 hearing, the acquittee's inpatient psychiatrist, Marilynn Stuart, agreed, stating, "[i]t's just that . . . he gets frustrated and feels powerless, like a lot of the patients do . . . ." As the acquittee's counsel noted, this led the board to conclude in a 2014 memorandum of decision that, " '[d]espite remaining clinically stable, [the acquittee] was unable to appropriately address his behavior with his treatment team in a timely manner, thus delaying his return to the community.' "

State *v.* Foster

uted to keeping him here longer than clinically necessary.

\* \* \*

"He's been here since he was in his twenties, and, now, he's in his early forties, but he has to keep working on when to try to be funny . . . ." (Kevin Trueblood, June 2, 2017).

- "[W]hen [the acquittee is] treated with respect, he responds appropriately. When he's treated disrespectfully, and that happens an awful lot, he responds in a childish and in a hurt way, and in a way that's not dissimilar perhaps [to] how many of us might respond if we're treated disrespectfully [in public]. We can't forget that. . . . [T]he cure for institutionalization is not perpetuating institutionalization.

\* \* \*

"[T]his is really difficult and politically incorrect to talk about, but there is also a pattern, not just with [this acquittee] . . . where, as patients get closer to moving out . . . [t]here's the crab in a bucket phenomenon, [that is] when one person starts to leave . . . everyone starts to pull them back down, and patients have a way of provoking other patients to act out, and, sometimes, this is something that spills over into staff . . . ." (Daniel Papapietro, June 2, 2017).

- "[I]n the old days of long-term psychiatric hospitalizations, a great many experts wrote about the regressive pull of long-term inpatient psychiatric facilities . . . . I think we've . . . gotten away from understanding just . . . how powerful that [pull] is, and, because of the very nature of the locked doors, the rules and restrictions and the limitations of freedom, that it has, by its very nature . . . an infantilizing pull on our patients . . . . [A]s a result, if what we do has an infantilizing effect on our patients, it has a parentifying effect on

State *v.* Foster

. . . us . . . . There is an iatrogenic cause, an environmental, external cause for a lot of [the acquittee's] behaviors, as well as an internal psychological cause . . . .

\* \* \*

"Now, it's not something [the acquittee is] going to grow out of while he's in our hospital. . . . I think we have sufficient evidence that, except for the one [index offense] some time ago, when he was out in the community, his behavior has been pretty much appropriate, that it's on an inpatient unit, with the severe limits, with the fact that the . . . most productive years of his life have been spent here, that there's a natural level of frustration and a natural regressive pull that is always going to end up in [the acquittee's] behaving childishly and in immature ways. . . . I haven't seen any evidence that the treatment environment that we have is going to be any more conducive to him getting better, and I do think that, when he was more involved in the outpatient community, he was getting better. . . . I certainly think that, psychologically speaking, he's more likely to benefit from a more normalized experience in a community [than] the restrictive and sometimes punitive experience of being in a hospital.

\* \* \*

"[W]hat I'm saying, and what I believe the hospital and the team [are] saying, is [that] we don't think those behaviors create a risk. We don't believe that [the acquittee] is going to regress in a dangerous way. . . . This is Groundhog Day for him. . . . [H]e keeps repeating the same things with the same kind of people over and over again. It's not healthy for him, and our system is not going to change, and it's not going to allow him to mature and behave in a more appropriate way." (Daniel Papapietro, June 2, 2017).

State *v.* Foster

- "I believe that the staff really need a lot of education. It's very difficult for them to understand that a patient, who is so tall and strong, could behave sometimes in a rather childish manner, but [the acquittee] is a delight to have on the unit. He is a kindhearted individual, and he really means no harm." (Rosina Bandanza, June 2, 2017).

- "[The acquittee has] been institutionalized for way too long . . . . We do not feel that his risk would be increased in the community, as long as he is with family or his mom."[22] (Rosina Bandanza, September 15, 2017).

- "This is a politically challenging conversation to have . . . but I think we have to at least acknowledge [that] sometimes staff don't always behave in the most appropriate ways, and it's easy to . . . push the blame off onto the patient. We believe that that, in fact, is a large part of what happened in this case. . . . It's unpleasant to have to suggest that maybe staff had been somewhat inappropriate, but I can't, in good conscience, be politically correct and try to avoid the issue and let the blame lie inappropriately [with] a patient . . . . It's not just unique to that unit. It is a part of the problem and difficulty of long-term hospitalization with staff and patients [who] spend a great deal of time together. . . . I just want to be absolutely clear that none of us [has] thought that this suggests . . . any symptomatic process from [the acquittee's] mental illness. This is just . . . part of [the] closed environment, living with people and having some conflict." (Daniel Papapietro, September 15, 2017).

Little of this commendably frank commentary has been included in the board's various reports and recommendations to the trial court over the years. None was addressed

---

[22] Notably, even though the acquittee's mother was a positive influence on his progress and she had moved closer to facilitate visits with him, staff have restricted his visits with her as a behavior management tool.

State *v.* Foster

in the court's decision, notwithstanding that it was all part of the record before the court. See, e.g., *State* v. *Putnoki*, supra, 200 Conn. 221 (trial court "should consider the entire record," including acquittee's mental health history).

## III

The foregoing analysis has doctrinal implications that may be useful to summarize for the purpose of providing future guidance in connection with the decisions required under § 17a-593. To summarize, in order to ensure that the statutory requirements and demands of due process are satisfied, it is incumbent on the board to provide, and for the trial court to restrict its analysis to, evidence relevant to whether the acquittee will pose an imminent danger to himself or others by virtue of his mental illness. The state bears the burden of proof to demonstrate, by clear and convincing evidence, that the acquittee poses such a danger.

To be legally relevant, the evidence of dangerousness must derive in material part from the acquittee's psychiatric disabilities, and not be the result of characterological or other behavioral traits that would create that danger, even in the absence of the disability. As much as possible, evidence relied on should be detailed, date-specific, and supported by expert testimony grounded in scientific research supporting the conclusion that the observed behavior is indicative of imminent dangerousness. It is not helpful, for example, for the board or the court simply to state that the acquittee has a history of inappropriate conduct or a history of treatment non-compliance.[23] That type of label may apply to a long

[23] The board's findings in this case often generalize from a few limited (and sometimes long outdated) incidents and distill highly nuanced testimony into a blunt and conclusory condemnation. For example, one of the few specific examples in the record of the acquittee's impaired judgment and impulsive behaviors, which the board continued to cite as arguments against discharge in 2023, was an immature but harmless incident in 2012 in which he put his face to the window of a psychotherapy group to distract the coordinator. Indeed, when asked in 2016 for examples of the acquittee's "poor frustration tolerance," his

State *v.* Foster

and continuing pattern of physical threats, altercations, and refusals to take prescribed psychiatric medications, or it could refer to nothing more than a few outdated, isolated incidents of juvenile prankishness, off-color remarks, or failures to attend a group therapy session. The former is legally relevant; the latter is not.

As a general guideline, the most directly relevant evidence would include a protracted or recent history of violent or criminal conduct; recent uncontrolled symptoms of psychosis or other mental illnesses that are linked to violence; recent incidents of refusal to take prescribed psychotropic medications or significant noncompliance with other recommended treatment modalities; recent incidents of prohibited alcohol or drug use (to the extent that the use of such substances is likely to result in decompensation for the individual in question); a recent history of threatening or aggressive conduct; a significant, recent failure to successfully navigate conditional release or other community visitation;[24] and scores on validated psychological instruments

inpatient psychiatrist, Marilynn Stuart, initially was unable to provide any examples. She ultimately described one incident in which the acquittee had playfully wrestled with another patient, as well as the fact that he could grow impatient with malfunctioning kitchen machinery. Although we assume that the trial court independently reviews all of the underlying testimony and evaluations, the board can be most helpful to the court by summarizing those assessments in a way that exposes, rather than obscures, the details relevant to the dangerousness inquiry.

[24] Nothing in this opinion should be taken to mean that it is wrong to require an acquittee to demonstrate an ability to successfully transition to independent community living through conditional release before being discharged. Imposing such a requirement is consistent with prevailing psychiatric practice, the empirical research establishing a strong negative correlation between successful conditional release and recidivism; see, e.g., M. Norko et al., supra, 34 Behav. Sci. & L. 439; and the legislative history of § 17a-593. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1985 Sess., p. 1513, remarks of Howard Zonana, Associate Professor, Yale Department of Psychiatry ("most hospitals want to have some opportunity to let somebody out gradually over increasing periods of time to see how they handle that responsibility especially after they've been either hospitalized or incarcerated for long periods of time"); id., p. 1519, remarks of Peter Zeman, Chairman of the Advisory and Review Board of Whiting Forensic Institute (similar comments).

There are two points, however, at which requiring a successful record of conditional release as a precondition for discharge becomes problematic. First, an

State *v.* Foster

that are predictive of violent or criminal conduct. This list is not necessarily exhaustive, but, before evidence is used in the prediction of dangerousness, there must be a valid basis to accord predictive value to that evidence.

Also relevant are the acquittee's index offenses, although the weight they carry should be proportionate to the recency, seriousness, and type of crime as those factors relate to the risk of recidivism. Similarly, the court may consider a history of criminal conduct prior to the index offenses, as well as testimony by mental health professionals that, although the acquittee has been generally not involved in the aforementioned conduct and more or less free of symptoms for a prolonged period of time, in their professional opinion, the acquittee would be likely to decompensate, and would be unable or unwilling to promptly seek help, if not under the board's supervision.[25]

acquittee may be deprived of the opportunity to successfully navigate conditional release for reasons that have little or nothing to do with his mental illness or dangerousness. This acquittee, for example, has had the opportunity for conditional release or other community visitation withheld as punishment for minor rule violations or unspecified "problematic interactions with staff" while committed. In its July, 2018 report to the court, the board conceded as much, acknowledging that the acquittee's "adolescent rebellion . . . [had] contributed to his hospitalization *for longer than clinically necessary.*" (Emphasis added.)

Second, we should be wary of imposing arbitrarily long conditional release requirements on the theory that we can never be sure that an acquittee will continue to thrive once the board's supervision is withdrawn. The evidence is that individuals who have successfully navigated some period of conditional release have quite low recidivism rates, especially for felonies. See M. Norko et al., supra, 34 Behav. Sci. & L. 439–41.

[25] This last consideration, if not cautiously invoked, can create a catch-22 that traps the acquittee in an institutionalized bind. Paradoxically, the only way an acquittee can disprove the alleged need for ongoing supervision is by being afforded some opportunity for independence. The same concern arises from the board's statements that it was disinclined to recommend discharge because the acquittee had been committed for so long and, therefore, had limited experience in the community. Although there is research to support the value of successful supervised community release as a predictor of nondangerousness, this sort of reasoning also risks creating a catch-22. The longer an acquittee is committed, the less experience he or she will have in the community, and the more difficult the transition to independence will potentially be.

State *v.* Foster

Finally, there are considerations that are largely or entirely irrelevant. Amorphous fears or general societal ills that are not specifically connected to the acquittee have no place in the analysis. This means that a trial court exercising its authority under § 17a-593 must at all times remember that its role in protecting society is constrained by evidentiary fact (as well as the statutory and constitutional framework placing the burden on the state) and cannot be animated by fears emanating from outside of the realm of proof. The danger in thinking of the statutory process primarily as a risk mitigation exercise is that we may lose track of the law's command that an acquittee must be discharged after the maximum term of commitment unless the state proves by clear and convincing evidence that he poses an imminent danger to himself or others.

Also irrelevant is idiosyncratic, or even offensive, behavior that leaves people feeling uncomfortable but bears no demonstrable relationship to dangerousness. See, e.g., *Addington* v. *Texas*, supra, 441 U.S. 426–27; *O'Connor* v. *Donaldson*, 422 U.S. 563, 575, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975); *State* v. *Krol*, supra, 68 N.J. 259. The same can be said of character traits such as oppositionality, impulsiveness, low frustration tolerance, and poor social skills, even if linked to dangerousness, unless those traits are proven, by clear and convincing evidence, to result in material part from psychiatric disability.[26] More specifically, without sufficient evidence of dangerousness, an acquittee cannot be detained indefinitely on the ground that he does not always obey institutional rules, adhere to institutional

---

[26] See Regs., Conn. State Agencies § 17a-581-2 (a) (5) (" '[m]ental illness' means any mental illness or mental disease as defined by the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association and as may hereafter be amended"); see also General Statutes § 17a-580 (7) (" '[p]sychiatric disability' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct"); part II B of this opinion.

State *v.* Foster

policies, or defer without complaint to institutional authority. The constitution simply does not allow it.

IV

Applying these principles to the case at hand, I conclude that much of the trial court's analysis was simply irrelevant, as I have discussed. Other considerations addressed by the court and the board, while relevant, are tempered by the passage of time. The acquittee committed the index offenses in 2001, when his schizophrenia was newly emerged and untreated, and he has no other criminal history.[27] During his initial years at Whiting Forensic Division of the Connecticut Valley Hospital, when his mental illness was still uncontrolled, the acquittee engaged in some fights with other patients and had one escape attempt. His most recent physical altercation was in 2014, but the incident occurred while he was clinically stable, and the record does not reveal that his conduct was linked to his illness. Some brief refusals to take his medications were reported in early 2016, but he has been compliant since then. As of 2019, he had not heard voices since 2009, when he was taking a different medication, and he had not experienced other psychotic symptoms during that period. Given the singular and relatively minor nature of the index offenses, one would think that—in light of the burden of proof, coupled with the clear and convincing standard of proof—a multiyear record of medication compliance, a lack of psychiatric symptoms,[28] and an absence of violent or criminal conduct, along with fifteen months of successful conditional release, would

---

[27] Family and friends described the acquittee's commission of the index offenses as being out of character.

[28] In 2019, there was a brief notation in his records that the acquittee sometimes believes that "bad things happen in the world . . . because of him," but there was no testimony that such beliefs are symptomatic of his mental illness or indicative of dangerous propensities, and this item was not relied on by the trial court.

State *v.* Foster

more than counterbalance this limited history of dangerousness. Indeed, this perspective is reflected in a July, 2019 report to the board in which Michael F. Genovese, a licensed clinical social worker commissioned by the state to evaluate the acquittee, concluded that, following a year of conditional release, "he does not present a significant risk to himself or others at this time."[29]

Still, our standard of review is deferential, and, in my view, the record is sufficient, if barely so, to support the trial court's conclusions. There was recent, albeit conclusory, testimony from the acquittee's consulting forensic psychiatrist that he would pose a risk to himself or others without ongoing supervision.[30] Also, in late 2016 and 2017, there had been several incidents in which the acquittee reasonably could be understood to have physically or verbally threatened female staff members, although it is questionable that such conduct was related to his mental illness.[31] See footnote 19 of this opinion. The acquittee also has periodically expressed skepti-

[29] In general, the recidivism rate for discharged acquittees is quite low, much lower than for convicted inmates upon their release from prison. See, e.g., M. Norko et al., supra, 34 Behav. Sci. & L. 425, 439, 441; J. Stankowski, "Acquittal by Reason of Insanity Is a Positive Outcome for Defendants Who Cannot Be Restored," 48 J. Am. Acad. Psychiatry & L. 244, 246 (2020). Of 196 acquittees discharged between 1985 and 2015 in Connecticut, only 16.3 percent were rearrested. M. Norko et al., supra, 432, 435–36. The majority of the rearrests were for infractions, misdemeanors or class D felonies. Id., 436. None was for class A felonies, and the average period from discharge to rearrest was nearly six years. Id.

[30] I am not comforted by the fact that the board and some of the acquittee's treatment staff have been repeating generic, conclusory statements of this sort for years, and have used them to justify requests for periods of recommitment of as long as five years. If the board is of the view that, despite years of compliance, nonviolence, and steady progress, the acquittee cannot be trusted to manage his disease independently, then the onus is on the board to explain and justify that belief and, within the bounds of safe patient management, to give him an opportunity to prove the board wrong.

[31] Because one incident followed a failed change to his medication, the trial court reasonably could have concluded that there was such a connection, although it made no such finding.

cism about his need to continue taking psychiatric medications, which, depending on the context of the statement, may raise a legitimate cause for concern.

At the end of the day, I am inclined to think that, with one-quarter century having passed since the acquittee committed the index offenses and many years since his last physical altercation, the only substantial questions to be resolved are (1) whether he is likely to continue to take his medications, to seek treatment for his mental illness, and to refrain from alcohol and drug use when he is no longer under the board's supervision, (2) if he fails to take those measures, whether his symptoms are likely to reemerge in a manner that might realistically inhibit his ability to seek medical attention, and (3) if those symptoms reemerge, whether it is likely that he will engage in behavior dangerous to himself or others. See, e.g., *State* v. *Dyous*, supra, 307 Conn. 311; *State* v. *Corr*, supra, 87 Conn. App. 727–28; see also *State* v. *Putnoki*, supra, 200 Conn. 222 (prior to *Metz* decision that adopted clear and convincing evidence standard, court assumed that trial court must find "that it was more probable than not that the defendant's progress was dependent on her medication and therapy"). To keep the acquittee committed, the state must establish all three propositions by clear and convincing evidence. The focus of future proceedings should be on addressing those questions with as much clarity, specificity, and scientific authority as reasonably possible.

For these reasons, I join in part I of the majority opinion and join in the result reached in part II.